UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ANDREA GORDON,
     Plaintiff,


     V.                              CIVIL ACTION NO.
                                        11-10103-GAO

MASSACHUSETTS BAY
TRANSPORTATION AUTHORITY and
SCOTT ANDREWS,
     Defendants.


**REPORT AND RECOMMENDATION RE:
THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(DOCKET ENTRY # 33)**

**MEMORANDUM AND ORDER RE:
DEFENDANTS' MOTION TO STRIKE
(DOCKET ENTRY # 63)**

**September 8, 2014**


**BOWLER, U.S.M.J.**

     Pending before this court is a motion for summary judgment (Docket Entry # 33) filed by defendants Massachusetts Bay Transportation Authority ("the MBTA") and Scott Andrews ("Andrews") (collectively "defendants"). (Docket Entry # 33). Defendants also seek to strike certain portions of plaintiff's response to their LR. 56.1 statement of undisputed facts and a number of exhibits plaintiffs filed to avoid summary judgment. (Docket Entry # 63). Plaintiff Andrea Gordon ("plaintiff") opposes both motions. (Docket Entry ## 45, 65). After conducting a hearing on July 28, 2014, this court took the

motions (Docket Entry ## 33, 63) under advisement.

Plaintiff submits that the MBTA denied her a promotion in 2007 based on her race (African American) and gender and in retaliation for her testimony in a discrimination lawsuit filed by Johnny Junior ("Junior"), an MBTA employee, against the MBTA and her protected activities concerning another MBTA employee, Terrence Ward ("Ward").  (Docket Entry # 1, ¶ 31).  In March 2008, Andrews, the MBTA employee awarded the promotion, purportedly subjected plaintiff to racist and hostile behavior during a staff meeting.  Finally, in June 2009 plaintiff saw a toy "truck with a gorilla" sitting next to "a Black man in a suit" on a supervisor's desk.  (Docket Entry # 1, ¶ 22).  The four count complaint sets out violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) ("Title VII"), based on race, gender and retaliation respectively in counts I, II and III.  Count IV alleges a common law claim for intentional infliction of emotional distress ("IIED").

STANDARD OF REVIEW

Summary judgment is designed "'to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'"  Dávila v. Corporación De Puerto Rico Para La Difusión Pública, 498 F.3d 9, 12 (1st Cir. 2007).  It is appropriate "if the movant shows that there is no

2

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). It is inappropriate "if the record is sufficiently open-ended to permit a rational factfinder to resolve a material factual dispute in favor of either side." <u>Pierce v. Cotuit Fire District</u>, 741 F.3d 295, 301 (1st Cir. 2014).

"Genuine issues of fact are those that a factfinder could resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence has the potential to change the outcome of the suit.'" <u>Green Mountain Realty Corp. v. Leonard</u>, 2014 WL 1613704, at *6 (April 23, 2014). The evidence is viewed "in the light most favorable to the non-moving party" and "all reasonable inferences" are drawn in his favor. <u>Ahmed v. Johnson</u>, 752 F.3d 490, 495 (1st Cir. 2014). Where, as here, the nonmovant bears the burden of proof at trial, she "'must point to facts memorialized by materials of evidentiary quality and reasonable inferences therefrom to forestall the entry of summary judgment.'" <u>Geshke v. Crocs, Inc.</u>, 740 F.3d 74, 77 (1st Cir. 2014); <u>see</u> <u>Woodward v. Emulex Corp.</u>, 714 F.3d 632, 637 (1st Cir. 2013) (as to issues on which nonmovant bears burden of proof, she must "'demonstrate that a trier of fact reasonably could find in his favor'"). "Even in employment discrimination cases 'where elusive concepts such as motive or intent are at issue,' this standard compels summary judgment if the non-moving party 'rests

merely upon conclusory allegations, improbable inferences, and unsupported speculation.'" Feliciano De La Cruz v. El Conquistador Resort and Country Club, 218 F.3d 1, 5 (1st Cir. 2000).

"Unsupported allegations and speculation do not demonstrate either entitlement to summary judgment or the existence of a genuine issue of material fact sufficient to defeat summary judgment." Rivera-Colon v. Mills, 635 F.3d 9, 12 (1st Cir. 2011); see Serra v. Quantum Servicing, Corp., 747 F.3d 37, 39-40 (1st Cir. 2014) ("allegations of a merely speculative or conclusory nature are rightly disregarded"). That said, a court "'should exercise particular caution before granting summary judgment for employers on such issues as pretext, motive, and intent.'" Adamson v. Walgreens Co., 750 F.3d 73, 83 (1st Cir. 2014) (quoting Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 54 (1st Cir. 2000)).

Defendants submit a LR. 56.1 statement of undisputed facts. Uncontroverted statements of fact in the LR. 56.1 statement comprise part of the summary judgment record.[1]  See Cochran v. Quest Software, Inc., 328 F.3d 1, 12 (1st Cir. 2003) (plaintiff's failure to contest date in LR. 56.1 statement of material facts caused date to be admitted on summary judgment); Stonkus v. City

---

[1]  The length of this opinion is partly a function of the 97 page response plaintiff filed to defendants' LR. 56.1 statement.

of Brockton School Department, 322 F.3d 97, 102 (1st Cir. 2003)
(citing LR. 56.1 and deeming admitted undisputed material facts
that the plaintiff failed to controvert).  Finally, in reviewing
a summary judgment motion, a court may examine "all of the record
materials on file," Ahmed v. Johnson, 752 F.3d at 495, "including
depositions, documents, electronically stored information,
affidavits or declarations . . . or other materials."
Fed.R.Civ.P. 56(c)(1).

FACTUAL BACKGROUND

I.  <u>Plaintiff's Vocational History</u>

Plaintiff graduated from the University of Massachusetts in
Boston with a bachelor of arts degree in anthropology in 1993.
In 2005, she earned a master's degree in management from Emmanuel
College.  (Docket Entry # 49-1, p. 2) (Docket Entry # 37-1, p.
4).[2]

In 1996, before earning the master's degree, the MBTA hired
plaintiff as a part-time vault agent.  (Docket Entry # 37-1, pp.
5 & 6).  Vault agents are primarily responsible for removing,
depositing and reinserting cash boxes into assigned fare boxes
for the MBTA.  Two years later, in August 1998, plaintiff became
a full-time motor person or train driver on the Orange Line.
(Docket Entry # 37-1, p. 7).  In 2000, plaintiff became a

---

[2] Page numbers refer to the docketed page numbers as
opposed to the page numbers in the actual exhibit.

performed revenue coordinator for the MBTA and held this position
for five years.  (Docket Entry # 37-1, p. 62).

As a performed revenue coordinator, plaintiff was
"responsible for the overall management of work assignments for
[the MBTA's] Collectors."  (Docket Entry # 49-1, p. 2).  In this
position, plaintiff ensured coverage for the collectors and
resolved problems within the department while "adher[ing] to
[MBTA] policies and procedures."  (Docket Entry # 49-1, p. 2).
Viewing the record and reasonable inferences in plaintiff's
favor, her supervisory experience began in 2000.[3]  (Docket Entry
# 49-1, pp. 2, 12) (Docket Entry # 49-1, p. 12).

II.  Plaintiff's Involvement in Discrimination Complaints

In March 2004, plaintiff witnessed an incident between
Junior, acting chief of subway operations at the time, and Robert
Doyle ("Doyle"), a white male, "during a meeting of supervisors,
superintendents and other MBTA officials."  (Docket Entry # 51, ¶
6).  During the meeting, she heard Dolye swear at Junior.

On or about June 24, 2004, after Junior complained
internally about the incident, he applied for the position of

_____

[3] The record is disputed as to the length of time of
plaintiff's supervisory experience and whether the above position
was a supervisory position.  In addition to the position of a
performed revenue coordinator, plaintiff was a spare revenue
supervisor and a spare subway supervisor.  A "*spare* supervisor"
does not "necessarily mean" supervisory experience throughout the
entire time the employee occupied the position.  (Docket Entry #
37-1, pp. 9-11, 86-86) (emphasis added).

Division Chief of Subway Operations at the MBTA.  The MBTA
awarded the position to Raymond Diggs ("Diggs"), a 34 year old
MBTA employee at the time.

On September 9, 2004, Junior, 49 years old at the time,
filed a complaint with the MBTA's Department of Organizational
Diversity ("OD").[4]  The complaint alleged that Doyle violated an
MBTA policy "regarding Dignity in the Workplace" as well as
another MBTA rule.  (Docket Entry # 50, p. 29).  The complaint
also noted that Doyle did not receive any discipline even though
Junior documented the incident and alerted various MBTA
officials, including the MBTA's Chief Operating Officer.  The
complaint additionally alleged that the MBTA chose Diggs, who had
no experience as a superintendent or as an acting chief, for the
position even though Junior had seven years experience as a
superintendent.

On September 10, 2004, Junior filed a complaint with the
Massachusetts Commission Against Discrimination ("MCAD") alleging
discrimination on the basis of race and age for being denied the
promotion.  Reiterating the allegations in the OD complaint, the
MCAD complaint added a retaliation claim based on Junior's
"internal complaints" about the March 2004 incident.  The MCAD

---

[4]  This court assumes that references in the record to the
Office of Civil Rights and Diversity, the Organizational
Diversity/Civil Rights and the Office of Diversity and Civil
Rights refer to the same MBTA department.

complaint included a memorandum from plaintiff to Junior. In the
March 24, 2004 memorandum, plaintiff described her version of the
incident. She characterized Doyle as acting "very unprofessional
and excited" as well as saying "f*** you" to Junior.[5] (Docket
Entry # 50-1, p. 14).

In March 2006, Junior filed a civil rights action in the
United States District Court for the District of Massachusetts
against the MBTA ("the Junior action"). (Docket Entry 50-1, p.
29). In July 2006, plaintiff testified by deposition. On May
16, 2007, Junior filed a pretrial memorandum listing plaintiff as
a witness. On May 23, 2007, a three member selection committee
for a transportation superintendent position agreed to award the
position to Andrews as opposed to plaintiff. Trial commenced in
the Junior action on May 29, 2007, and the first witness
testified on May 30, 2007.

At trial, plaintiff testified that she witnessed Doyle swear
at Junior and that Doyle's conduct violated a number of MBTA
rules and policies. She also testified that, had it been Junior
who swore at Doyle, Junior "would have been disciplined or
probably terminated." (Docket Entry # 51, p. 9). Plaintiff
further testified that:

-------

[5] Defendants therefore argue that the MBTA knew about
plaintiff's protected activity of assisting a co-worker with his
discrimination complaint in 2004 and the passage of time is
therefore too great to infer a retaliatory motive for the denial
of the promotion in 2007.

> [R]acism and discrimination were systemic and pervasive at
> the MBTA; that black employees are disciplined more harshly
> than white employees for the same offense and . . .
> systematically qualified black employees are bypassed for
> promotions by less qualified, less experienced and less
> educated white individuals.

(Docket Entry # 51, p. 9).  Drawing reasonable inferences in

plaintiff's favor, plaintiff's July 2006 deposition testimony was

similar in nature and not favorable to the MBTA.  After a seven

day trial, the jury found in favor of the MBTA on all counts.

(Docket Entry # 37-2, p. 11).

In addition to plaintiff's involvement in the Junior action,

she filed a complaint against Mary M. Dunderdale ("Dunderdale"),

a human resources employee.[6]  (Docket Entry # 51-4, p. 9).  In

particular, on August 4, 2004, plaintiff filed an internal

complaint with OD about being bypassed for a promotion to the

positions of AFC Smart Card Program Manager and Assistant

Director for AFC Operations Installation.  Dunderdale, who is

white, was the chairperson of the three member selection

committee that denied plaintiff the promotion in May 2007.

The August 4, 2004 complaint to Jeanne Morrison

("Morrison"), Director of Organizational Diversity, asserted that

Dunderdale sent plaintiff rejection letter[s] and thereafter told

her that she was not awarded the AFC Smart Card Program Manager

---

[6] Dunderdale testified that Junior also filed a race
discrimination or retaliation complaint against her.

9

position because she did not submit a resumé.[7] The OD complaint, which alleges that the MBTA already had plaintiff's resumé, asserted that plaintiff was "retaliated against and bypassed for [the] promotion" because of the aforementioned statement plaintiff made in support of Junior's civil rights complaint. (Docket Entry # 51-5, p. 3). Plaintiff sent a copy of the complaint to Michael Mulhern ("Mulhern"), General Manager of the MBTA at the time.

Dissatisfied with the response from OD, on August 30, 2004, plaintiff wrote a memorandum to Mulhern regarding the "Disparate Treatment" and being forced to attend a meeting about the complaint without union representation.[8] (Docket Entry # 51-5, p. 5). Plaintiff sent a copy of the memorandum to the civil rights division of the Massachusetts Attorney General's Office and Morrison.

On September 10, 2004, plaintiff filed a grievance with her union, the Alliance of Unions of the MBTA ("the union"). The grievance complained about the MBTA not selecting or interviewing her for the two positions. (Docket Entry # 51-2, pp. 29-31). It asserted that she did not receive an interview or either position

_____

[7] Plaintiff's recitation of what Dunderdale told her is not considered for the truth of the matter asserted.

[8] The memorandum refers to the above noted "complaint against Human Resources" which plaintiff testified refers to the August 4, 2004 complaint. (Docket Entry # 51-5, p. 5) (Docket Entry # 51-4, p. 13).

"in retaliation for providing" the "witness statement for the pending investigation involving" Junior, Doyle and Jeff Parker, the Director of Subway Operations who "failed to take adequate disciplinary action against Dolye." (Docket Entry # 51-2, p. 29). On October 26, 2004, Diggs, the same individual selected earlier in the year for the Division Chief position over Junior, denied the grievance. (Docket Entry # 51-2, pp. 30-31).

At some point in time before the end of the year, plaintiff filed a complaint with MCAD alleging that the MBTA denied her interviews and the positions in retaliation for her testimony in the Junior action.[9] (Docket Entry # 51-2). On December 14, 2004, plaintiff filed an attachment to the union grievance. The attachment specifically complained about Dunderdale and the "retaliatory actions" because of plaintiff's "involvement in the

_____

[9] The summary judgment record includes plaintiff's December 2, 2004 rebuttal to the MCAD's position statement. It does not include the MCAD's investigative disposition or findings and recommendations. A MCAD or EEOC investigative finding may be admissible evidence although the "probative force in individual cases varies considerably and is left to the determination of the trial court." Hilton v. Wyman-Gordon Co., 624 F.2d 379, 383 (1st Cir. 1980); Dickinson v. UMass Memorial Medical Group, 2011 WL 1155497, at *8 (D.Mass. March 24, 2011) ("First Circuit has repeatedly confirmed the probative value of reports from MCAD and the Equal Opportunity Employment Commission" while noting that probative force varies) (citing Hilton, 624 F.2d at 383); see Fed.R.Evid. 803(8)(A)(iii). As discussed in footnote 26, a grievance or brief submitted to the MCAD amounts to hearsay. If not offered to prove the truth of the matter asserted but, rather, knowledge on the part of Dunderdale or others that plaintiff engaged in protected activity or bias on the part of a decisionmaker, the MCAD grievance or brief is not hearsay and is considered for those purposes.

protected activities of being a witness in the Johnny Junior matter." (Docket Entry # 51-5, p. 9).

Plaintiff also made a number of internal complaints to OD "about differences that [she] saw in discipline." (Docket Entry # 51-3, p. 12). She could not remember if the complaints predated the denial of the 2007 promotion.

Plaintiff was involved in an employee group at the MBTA known as the Employees for Civil Rights ("EFCR"). Plaintiff testified that "the [MBTA] knows about the organization." (Docket Entry # 51-3, p. 19). At an undetermined time, plaintiff, as a representative of EFCR, "spoke at a round table" event attended by the General Manager of the MBTA and senior MBTA managers including Christine Bond ("Bond"), a supervisor or director in the human resources department. (Docket Entry # 51-3, pp. 21-23). Ward, a longstanding advocate for civil rights at the MBTA, founded the group to give MBTA employees a vehicle "to express their concerns regarding racism and other forms of discrimination and retaliation" at the MBTA.[10] (Docket Entry # 51, p. 11). Ward was president of the group, until he retired from the position, and plaintiff was vice president. As an EFCR representative, plaintiff attended "several meetings with high ranking officials of the MBTA." (Docket Entry # 51, p. 11).

---

[10] The retaliation count refers to plaintiff's protected activities concerning both Junior and Ward. (Docket Entry # 1, ¶ 13).

Ward also formed the Concerned Minority Employees ("CME")
group at the MBTA. (Docket Entry # 51, p. 11). Dunderdale had
heard about the group but did not have "much knowledge" about it.
(Docket Entry # 37-1, pp. 69-70). She had also heard Ward's name
but never had a conversation about him. She did not know that
Ward or plaintiff were affiliated with the group. According to
plaintiff's affidavit, Ward appeared on television and gave
interviews to newspapers about the "pervasive and systemic
racism" at the MBTA. (Docket Entry # 51, p. 11).

Plaintiff states she "was deposed on several occasions and
provided testimony for [Ward] in his cases against the MBTA"
about "retaliation and race discrimination." (Docket Entry # 37-
1, pp. 20-21) (Docket Entry # 51, p. 11). She does not remember
the dates.

Deborah Gies ("Gies"), another member of the selection
committee, did not know that plaintiff testified on Ward's behalf
in his case against the MBTA although she did know that plaintiff
"was part of the case." (Docket Entry # 37-2, pp. 42-43). Gies
does not know the identity of the members of CME. She is
familiar with Ward's name but did not know that Ward and
plaintiff were good friends or that they were involved in CME.
Gies denied having any discussions with any MBTA employee about
plaintiff's activities with Ward. Joseph Casey ("Casey"),
another member of the selection committee for the 2007 position,

is familiar with Ward's name but he does not know Ward or that Ward filed discrimination complaints against the MBTA. (Docket Entry # 37-2, pp. 28-29).

In short, before the denial of the promotion in 2007, plaintiff testified at the July 2006 deposition and wrote the March 2004 memorandum filed as part of Junior's 2004 MCAD complaint against the MBTA. In 2004, plaintiff filed an internal complaint and a union grievance against Dunderdale about being denied the two promotions as a result of her activity in the Junior action. In 2004, plaintiff filed the MCAD complaint against the MBTA alleging retaliation based on the denied interviews and promotions to the two positions. At undetermined times, she gave deposition testimony in Ward's cases against the MBTA and complained to OD about differences in discipline at the MBTA.

Two MBTA employees also filed complaints against Gies. Gies testified by deposition that Michelle DiManche ("DiManche") had filed a complaint against her either with the MBTA, OD or the MCAD. Gies also testified that Perry Spencer ("Spencer") might have filed a discrimination or harassment complaint against her with the MBTA, OD or the MCAD. Plaintiff testified that DiManche, Spencer and two other MBTA employees, Marlene Rameaux ("Rameaux") and Francis Seisay ("Seisay"), filed discrimination

complaints against Gies for receiving disparate discipline.[11]
(Docket Entry # 51-4, pp. 6-8) (Docket Entry # 51, p. 10).
Viewing the record in plaintiff's favor, Gies was the subject of
at least four discrimination complaints brought by four MBTA
employees, all of whom are black.[12]

III.  MBTA's Selection Policy

        Before addressing the 2007 denial of the promotion, it is
helpful to outline the history and parameters of the MBTA's
selection or promotion policies.  In February 1997, the MBTA
entered into an agreement with the Attorney General of
Massachusetts ("the Attorney General") after a 16 month
investigation into allegations of race and gender discrimination
at the MBTA.  (Docket Entry ## 51-6, 51-7).  As stated in the
agreement, the MBTA agreed to "take effective action to prevent
and eliminate discrimination and harassment on the basis of race,

--------------------------------

        [11]  Gies testified that she did not know or could not recall
whether Rameaux or Seisay filed complaints against her.

        [12]  Throughout plaintiff's opposition to summary judgment,
she refers to the "fact" that Dunderdale and Gies, members of the
selection committee, had "multiple claims of racial
discrimination" lodged against them by MBTA employees and, as to
Dunderdale, by plaintiff.  (Docket Entry # 46, pp. 4, 5, 7, 11-
14).  Plaintiff's LR. 56.1 response contains similar, duplicate
citations.  As to plaintiff's complaints against Dunderdale, all
of plaintiff's citations to the summary judgment record refer
back to the above described evidence regarding plaintiff's 2004
complaints.  During plaintiff's deposition, she widened the
target of complaints by these four employees to include Christine
Cassino ("Cassino"), an MBTA supervisor on the Green Line.  It
was Cassino's desk that had the toy truck with a gorilla and a
black man in a suit in June 2009.

color, national origin, ancestry, sex, sexual orientation, religious creed, age and disability with regard to employment or the terms and conditions of employment including, but not limited to, promotions, terminations, transfers, job assignments and discipline." (Docket Entry # 51-6).

In April 1997, a posting requirement went into effect requiring the MBTA to post job openings except for executive level positions. (Docket Entry # 51-7, p. 27). In a report issued one year after the agreement, the Attorney General noted areas of progress as well as delays in implementation. (Docket Entry # 51-7).

In 2001, the MBTA issued a "Hiring and Selection Process" to "ensure that all potential candidates have equal access to position vacancies." (Docket Entry # 37-2). The policy sets out "specific guidelines by which vacant positions shall be filled." (Docket Entry # 37-2). The process instructs the MBTA to fill "vacant positions through a competitive, merit based process." (Docket Entry # 37-2).

In addition to posting job vacancies, the process involves a chairperson selecting candidates for interviews and a selection committee interviewing and scoring the selected candidates. The chosen candidate is usually "[t]he person that scores the highest" in the interviews. (Docket Entry # 37-1, p. 83) (Docket Entry # 37-2, p. 52).

In greater detail, the selection committee is "comprised of representatives from the hiring department and Human Resources." (Docket Entry # 37-2, p. 17).  The policy dictates that the representative from human resources "shall serve" as the chairperson of the committee.  (Docket Entry # 37-2, p. 17).  The selection committee develops "questions to determine the most competent candidate," interviews the "candidates for the position," records the answers, scores "the responses of each candidate" and decides "the recommended candidate for the open position."  (Docket Entry # 37-2, p. 17).

The chairperson is responsible for managing and coordinating the interview and the selection process.  He or she trains "the selection committee on its roles and responsibilities," defines "the parameters for conducting the interview," communicates "the selection committee process to" the candidates, manages "the post-interview scoring and recommendation process" and contacts the "successful and unsuccessful candidates."  (Docket Entry # 37-2, p. 17).

After a job posting closes, the chairperson performs "a fair and objective paper screen of all applications."  (Docket Entry # 37-2, p. 18).  The chairperson compares each resumé and application against "minimum entrance requirements" ("the MERs") for the position listed in the job posting and determines whether a candidate meets the MERs.  (Docket Entry # 34) (Docket Entry #

37-2, pp. 18, 51-52) (Docket Entry # 37-1, p. 74). The MERs includes a certain number of years of experience and education for a position. To paper screen the applications:

> The Chairperson prepares a grid with fields to record the name, gender, racial/ethnic background (if known), source (internal/external), and minimum entrance requirements (MERs); information for each candidate is entered into the grid. For each candidate, the chairperson indicates whether the candidate meets each MER individually and as a whole.

(Docket Entry # 37-2, p. 18). The information is then "tallied, and the committee determines how many candidates meet the MERs" and "selects a list of qualified applicants for the interview." (Docket Entry # 37-2, p. 18).

Once a candidate meets the MERs for the position and is selected for an interview, the applicant's qualifications, including his or her level of education and amount of supervisory experience, are no longer considered in the selection process. (Docket Entry # 34, ¶ 7) (Docket Entry # 37-2, p. 18) (Docket Entry # 37-1, pp. 74-76). Instead, it is the interview process that determines the candidate who gets the position.[13] (Docket Entry # 37-1, p. 76). Thus, if an applicant exceeds the MERs for a position by having additional years of education or supervisory experience, the applicant does not get "extra credit" for these additional years. (Docket Entry # 37-1, pp. 75-76) (Docket Entry

---

[13] As discussed below, plaintiff had more education and supervisory experience than Andrews. She did not however perform as well as Andrews during the interviews.

# 37-2, pp. 35, 52-53).

Casey explained that "years ago . . . [applicants] used to get points for education." (Docket Entry # 37-2, pp. 32, 69). He further stated that this practice ended and that by 2007 "extra credit for a[n] educational degree" was "no longer in place." (Docket Entry # 37-2, p. 35). According to Casey, the new policy had "the effect of widening the pool of applicants who were qualified." (Docket Entry # 37-2, p. 33). Gies testified that the new policy enabled all candidates who met the MERs to be on "equal ground going into an interview." (Docket Entry # 37-2, p. 53).

Once qualified, the selection committee interviews each applicant. Candidates are asked the same questions in the same order by the same committee member. Initially, the chairperson requests a list of technical questions and answers related to the position from the applicable hiring department. The chairperson then "reviews questions submitted by the hiring department to ensure that they are job related, non-discriminatory, and fair to both internal and external candidates." (Docket Entry # 37-2, p. 19). The chairperson also types the "questions into guides to be used during the interviews" and gathers other material for the interviews. (Docket Entry # 37-2, p. 19).

During the interview, selection committee members write down the applicant's salient responses or answers to each question.

They also score each answer on a scale of zero to ten. (Docket Entry # 50, p. 17) (Docket Entry # 51-1, p. 22) (Docket Entry # 37-2, pp. 76, 91, 108) (Docket Entry # 37-3, p. 2).

After completing the interviews for a position, the selection committee members review and "go over" the questions and answers. (Docket Entry # 37-1, p. 90). Each committee member scores his or her own interview answer sheets. (Docket Entry # 37-1, p. 91). Scores from selection committee members are added together for each applicant. The applicant with the highest aggregate score "gets the job." (Docket Entry # 37-1, p. 83). OD receives a copy of the scoring sheets.

"Upon completion of the selection process," the chairperson processes the hiring documents. He or she communicates the selection committee's decision to OD "through a recommendation memorandum." (Docket Entry # 37-2, p. 21). The memorandum summarizes the process and breaks down the number of applicants meeting the MERs by gender and race, the number selected for interviews by race and gender and the race and gender of the selected candidate. After additional review by "the HR Organizational Analysis and Compensation" department, the chairperson forwards a final package to "Human Resources, Budget and" OD directors "for signatory approval." (Docket Entry # 37-2, p. 22).

In addition to the published selection policy just

described, a "participant's manual" captioned "Civil Treatment for Managers Fair Employment Rights and Responsibilities" and published by Employment Learning Innovations, Inc. ("the manual") instructs managers to use "objective criteria" in making business decisions about hiring and promotions. (Docket Entry # 51-13, pp. 2, 6). The MBTA's "T" within a circle symbol appears on the cover page. The manual defines objective criteria as "those that are based on specific aspects of performance" such as "experience, past work history, and educational background." (Docket Entry # 51-13, p. 4). The manual also sets out a number of guidelines for making business decisions such as to "[a]lways hire/promote the most qualified candidate."[14] (Docket Entry # 51-13, p. 6).

IV.  <u>Plaintiff's Promotion in 2005</u>

---

[14]  Plaintiff insists that the manual requires the MBTA to promote qualified candidates using the objective criteria of education and experience. As described below, the MBTA considered education and experience during the first phase of a two phase process for the 2007 position. The second phase consisted of interviews which plaintiff maintains were subjective and contravened the "policy" or "MBTA guidelines" in the manual. (Docket Entry # 46).

The MBTA moves to strike the manual because "plaintiff is not qualified to explain the training course or explain nuances of applying the 'FACT Model [to] minimize the risk of illegal discrimination' (see Exhibit 24) and compare that to the Selection Policy, which utilizes a combination of subjective and objective elements to determine what candidate to promote." (Docket Entry # 63). While there may be other reasons to strike the document, plaintiff's interpretations of the manual are simply argument and do not provide a basis to strike the manual.

In October 2005, plaintiff applied for a position of Supervisor of Transportation-Subway ("Transportation Supervisor"). (Docket Entry # 37-2, p. 62) (Docket Entry # 37-1, p. 13). A total of 63 candidates applied. The applicants consisted of 35 white males, eight black males, one Hispanic male, six white females, six black females, one Asian female, one Native American female, three males of unknown race and two females of unknown race. (Docket Entry # 37-2, p. 64).

The MERs for the position in the job posting reads as follows:

> a high school diploma or equivalent (G.E.D.) with the ability to comprehend, communicate and respond to instructions, orders, signs, notices, inquiries, etc. in English; five years of experience in rapid transit or light rail transportation field operations; current full-time status; related experience in a supervisory capacity; effective organizational and analytical skills; working knowledge of Word, Excel, Database, PeopleSoft or Main Frame applications.

(Docket Entry # 37-2, p. 62).

Of the applicants for the supervisor position, 39 met the MERs for the job and received invitations to interview for the position. Donna R. Scott ("Scott"), a black MBTA employee in human resources, chaired a four member selection committee and drafted a memorandum recommending 13 candidates, including plaintiff, for promotion. (Docket Entry # 37-2, p. 64) (Docket Entry # 47, ¶ 28) (Docket Entry # 35, ¶ 28). Plaintiff had alleged Scott "retaliated against her just over a year earlier"

in the August 2004 OD complaint.  (Docket Entry # 47, ¶ 28)

(Docket Entry # 35, ¶ 28) (Docket Entry # 51-5, pp. 2-3).

Plaintiff received the promotion.  (Docket Entry # 51, p. 9, ¶ 5)

(Docket Entry # 49-1, p. 2).

V.   <u>Plaintiff's Bypassed Promotion in 2007</u>

In April 2007, plaintiff applied for the posted position of

Superintendent of Transportation ("Transportation

Superintendent") in subway operations.  (Docket Entry # 51, p. 9)

(Docket Entry # 37-2, p. 66).  The application process was

"similar" to the application process for Transportation

Supervisor.  (Docket Entry # 37-1, p. 22).

The posting set out the MERs for the position which

required:

> a high school diploma or equivalent (G.E.D.) with the
> ability to comprehend, communicate and respond to
> instructions, orders, signs, notices, inquiries, etc.
> in English; six (6) years of experience in
> transportation field operations; related experience in
> a supervisory capacity; effective organizational and
> analytical skills; working knowledge of Word, Excel,
> Database, PeopleSoft or Main Frame applications.

(Docket Entry # 37-2, p. 66).  An applicant could satisfy the six

years of experience in transportation field operations via

either subway or bus operations.  (Docket Entry # 37-1, p. 73).

The MERs also allowed substitution of "a degree in business,

transportation or a related field" for a portion of the six years

of experience in transportation field operations.  (Docket Entry

# 37-2, p. 66).  An applicant could not substitute this education

for the required supervisory experience.  The posting also identified "preferences" which included "a degree in business, transportation or a related field."  (Docket Entry # 37-2, pp. 66-67).  The preference category is used only to narrow down the number of candidates for interviews if there is an unmanageably large number of applicants who meet the MERs.  (Docket Entry # 34).  For this particular position, the selection committee interviewed each applicant who met the MERs.  Accordingly, the preference category was not utilized.  (Docket Entry # 34).

A total of 20 applicants applied for the position.  The applicant pool included 13 white men, one Hispanic man, one Hispanic female, three black men and two black females.  (Docket Entry # 37-2, p. 69).

In the human resources department, Dunderdale "was responsible for filling vacant positions in" subway operations.  (Docket Entry # 34).  Scott, Dunderdale's boss at the time, made the decision that Dunderdale would sit on the selection committee.[15]  (Docket Entry # 51-1, p. 10).  As the human resources representative and in accordance with the selection policy, Dunderdale served as chairperson of the selection committee.  (Docket Entry # 37-2, p. 17).  As chairperson, Dunderdale took "the lead role in managing" the process.  (Docket

---

[15]  Jane Marra, who is white, was the director or head of human resources at the time.

Entry # 37-1, p. 78).  The parties agree that she followed the
MBTA's selection policy in filling the position.  (Docket Entry #
47, ¶ 30) (Docket Entry # 35, ¶ 30).

In performing the paper screen, Dunderdale checked each
applicant's resumé and application against the MERs in the
posting.  (Docket Entry # 34, p. 2).  Of the 20 applicants, ten,
including plaintiff, met the MERs and received interviews.
(Docket Entry # 37-2, p. 69).  Dunderdale eliminated seven of the
13 white male applicants because they did not meet the MERs for
the position.

In accordance with the selection policy, Dunderdale prepared
a grid.  (Docket Entry # 37-2, p. 18).  The grid provided spaces
for "yes" or "no" responses indicating whether the applicant had
the necessary experience in transportation field operations and
related supervisory experience.  In performing the task,
Dunderdale compared each applicant's resumé and application to
the MERs for the position.  She placed a "Y" next to plaintiff's
name to indicate that plaintiff met the MERs of possessing a high
school diploma or G.E.D.  Dunderdale also placed a "Y" in the
columns that indicated plaintiff had six years experience in
transportation field operations and the related supervisory
experience.  (Docket Entry # 37-2, p. 71).

Plaintiff also received a "Y" in a preference category
showing she had a degree in business and a "Y" in another column

showing she had experience as a supervisor of transportation. Dunderdale completed plaintiff's assessment by placing a "Y" in the column indicating that plaintiff met the MERs. (Docket Entry # 37-2, p. 71).

The MERs grid additionally shows that three other candidates besides plaintiff had "Y" entries across each column next to their names. These individuals consisted of Andrews, Kevin Graney, a white male, and Jacques Celestin, a black male. (Docket Entry # 37-2, Ex. 15, p. 71). The remaining six candidates who met the MERs and received interviews had "Y" entries in all columns except the degree preference category. (Docket Entry # 37-2, p. 71).

Plaintiff and Andrews, the individual ultimately selected for the position, both satisfied the MERs for the position. Plaintiff, however, had seven years of supervisory experience whereas Andrews, who began working at the MBTA in 1987 as a bus operator, had three years of supervisory experience. (Docket Entry # 51-1, p. 14) (Docket Entry # 50, p. 8) (Docket Entry # 49-1, pp. 12-13) (Docket Entry # 51-13, p. 8) (Docket Entry # 37-1, p. 62). Plaintiff also had more education than Andrews. Whereas plaintiff had a master's degree in management and a bachelor of arts degree Andrews only had a bachelor of science degree.

Dunderdale knew Andrews on a casual basis to say hello in

passing prior to the May 2007 interviews.  When Dunderdale
notified Andrews that he was selected for an interview, he asked
her for the names of the interviewers.  Andrews testified that he
found out that Gies would be on the interview panel when
Dunderdale notified him that he satisfied the MERs and would
receive an interview.

In addition to Dunderdale, the selection committee consisted
of Gies and Casey, "both from Subway Operations, the hiring
department." (Docket Entry # 34).  Gies, division chief of the
Green Line at the time, and Casey are white.[16]  Dunderdale
testified that "in most interviews, someone from OD usually [sat]
in on the interviews" in 2007.  (Docket Entry # 51-1, pp. 8-9).
At the time of plaintiff's interview, however, there was a
shortage of representatives from OD.  Hence, Dunderdale did not
believe it was odd that the selection committee did not include
an individual from OD.  Dunderdale did not know who decided not
to have someone from OD sit in on the interviews.[17]

---

[16] At the time of plaintiff's application, Anna Barry
("Barry") was the Director of Subway and Bus Operations and Kevin
McGuire ("McGuire") was Chief Operating Officer for Subway and
Bus Operations.  Barry and McGuire are white.  Daniel Grabaukus
was the MBTA's General Manager.

[17] Plaintiff's description of the record (Docket Entry # 47,
¶ 12) is not entirely accurate.  Dunderdale testified as follows:

   Q.  And who decided not to have someone from OD sit in on
   that interview?
   A.  I don't know.

Andrews did not speak to either Gies or Casey before his interview. Andrews did have a friend, Steven McKeon,[18] an MBTA employee whose son played baseball with Andrews' son, who worked on the Green Line and therefore knew Gies. Before the interview Andrews told his friend that he "was putting in for the position." (Docket Entry # 49-1, p. 6). Andrews had no idea if his friend ever spoke to Gies about his candidacy. (Docket Entry # 49-1, pp. 6-9).

Before the interviews, Subway Operations, as the hiring department, submitted seven interview questions along with model answers. Dunderdale included the questions from Subway Operations as well as "a question from Human Resources and one from the [MBTA's] Office of Civil Rights and Diversity." (Docket Entry # 34). Gies testified that she could "not remember who" drafted the interview questions. (Docket Entry # 51-12, p. 14).

Dunderdale typed the predetermined questions into interview guides that selection committee members used to take notes of candidates' answers. (Docket Entry # 34, ¶ 12). The interview guides contained spaces for the candidate's name, the selection

_____

(Docket Entry # 51-1, p. 10).

[18] The above spelling is taken from Andrews' deposition. (Docket Entry # 49-1, p. 5). "Stephen" McKeon, a supervisor on the Green Line, provided an affidavit that defendants filed in this action. (Docket Entry # 37-4, p. 17). This court draws the reasonable inference that Steven and Stephen McKeon are the same person.

committee member's name and the date of the interview. (Docket Entry # 37-2, pp. 76-84). They also had spaces for each committee member to record a score for each answer. (Docket Entry # 37-2, pp. 76-84).

The interview guides described the numerical scores as: ten points for an excellent answer because the candidate "[a]nswered the question fully and completely"; eight points for a very good answer because the candidate "[a]nswered most of the question"; six points for a good answer because the candidate "[r]esponded with the most salient points"; four points for a fair answer because the candidate "[m]issed important item(s) in the response"; two points for a poor answer because the candidate provided an "[i]nadequate response" by missing "several important factors in answer"; and zero points for an unsatisfactory answer because the candidate either "[d]id not answer the question or gave an incorrect response." (Docket Entry # 37-2, p. 76).

Eight of the nine predetermined questions related to the duties and responsibilities of the position and what actions the candidate would take if confronted with certain situations on the job. An additional question asked about the candidate's familiarity "with the MBTA's EEO and Prevention Harassment policies." (Docket Entry # 37-2, p. 81). One question allowed the candidate to identify his or her experience by asking the candidate to "describe the most relevant and specific strengths

you have gained in your experience, which you can bring to this position."[19] (Docket Entry # 37-2, p. 78). On the day of an interview, each committee member received resumés for each candidate.

During the interviews, the same committee member asked the same questions to each candidate in the same order. Dunderale, Casey and Gies recorded the candidate's answers on their interview guides during the interviews.

Gies testified that she wrote down the candidates' "answers, based on what they" said and that she wrote "down everything." (Docket Entry # 51-12, pp. 15-16). In fact, she wrote two more pages of notes to record Andrews' responses than either Casey or Dunderdale wrote. (Docket Entry # 51-14, pp. 6-10, 20-22, 24-26). Gies acknowledged it was not possible to record every word a candidate said in response to a question. (Docket Entry # 51-12, p. 15).

Dunderdale testified that she wrote down the "salient points" of the candidates' answers. (Docket Entry # 51-1, p. 22). She conceded that she could have missed something that a

---

[19] Thus, each candidate had the opportunity to identify his or her education and experience for the job during the interview. In answering this question, plaintiff pointed out that she had a master's degree. In describing selection committee interviews in general as opposed to plaintiff's or Andrews' interview, Casey stated that, "We're always asking, in interviews, if the candidates had any management experience before coming to the T." (Docket Entry # 50, p. 9). Casey also noted that his selection committee asked him questions about his experience.

candidate said during the process.  (Docket Entry # 51-1, p. 24).

After the interviews but on the same day, Dunderdale, Gies and Casey each scored the candidates' answers on their interview guides and arrived at a total score for each candidate.  As a group, they met and went "over the questions as well as the answers."  (Docket Entry # 51-1, p. 28).  They discussed each question and Dunderdale "made sure that we . . . recorded things properly," according to Casey.[20]  (Docket Entry # 50, p. 12).  Casey explained that Dunderdale did not decide how many points a candidate received for each answer.  Dunderdale testified that after the interview, she "may have to ask a question" to other committee members to clarify whether candidates "even if they didn't say the precise words, they got the point."[21]  (Docket

_____

[20]  Casey described that after the interviews the selection committee reviewed each question together:

A.  –and I might say, if you're [Dunderdale], I might say, "Okay, I heard this.  This is what I heard," and if I was mis--
Q.  And she might say, "Well, I didn't hear that."
A.  Or I might give you 6 points and she might give you 8, and she'd say, "Why did you give 6?"  "Because I didn't hear him or her say this," and then she would correct me.  I think it only happened probably once in my career . . .."

(Docket Entry # 50, p. 12).  Plaintiff argues, inaccurately, that Dunderdale corrected the scores of the "other committee members when she deemed those scores to be incorrect."  (Docket Entry # 46).

[21]  Dunderdale's testimony, in greater detail, is as follows:

Q.  Okay.  Well, I mean, when you say "we go over," do you talk about it out loud, or does everybody score their own

31

Entry # 51-1, p. 91).

Casey described the scoring process as "kind of subjective." (Docket Entry # 50, p. 18). When asked why he gave Andrews a ten for his answer to the first question while Dunderdale awarded him a nine, Casey stated that, "I gave him a 10 because he said everything I wanted to hear." (Docket Entry # 50, pp. 17-18). In response to a question at Gies' deposition whether there was "some kind of subjectivity to grading" the candidates' answers, Gies replied, "I guess there's a little subjectivity, yes." (Docket Entry # 51-12, pp. 26-27). Casey also testified that he would not "change anything unless somebody could prove to me that it was said. If I didn't hear it, you are not getting the points." (Docket Entry # 50, p. 14). He also surmised that a "better way of testing" would be to have the candidates "write

---

sheet?
A. Everybody scores their (sic) own sheet.
Q. Okay.
A. But there may be a time when I may have to ask a question.
Q. Okay.
A. Because of the fact that they may not be saying the thing, but they may–it's so hard for me to explain. I don't know how to explain it, but they may be asking–they may be answering the question but [referring to her interview notes] it's not really what's here.
Q. Okay. So you will clarify––
A. I want it clarified.
Q.––and make the person, even if they didn't say the precise words, they got the point.
A. That is correct.

(Docket Entry # 51-1, p. 29).

their own answer" to the questions.  (Docket Entry # 50, p. 13).

The highest possible score for a candidate was 270 if each committee member gave the candidate a ten for all nine questions. Andrews received a total score of 248 which was the highest of all ten candidates.  (Docket Entry # 34, p. 4).  Casey, Gies and Dunderdale respectively gave Andrews total scores of 83, 83 and 82.  (Docket Entry # 37-2, p. 86).  With a score of 220, plaintiff tied for fifth place with two other candidates.  Casey, Gies and Dunderdale respectively gave plaintiff total scores of 73, 74 and 73.  (Docket Entry # 37-2, p. 86).  The four candidates who scored higher than plaintiff were white males.

On question one, Casey, Gies and Dunderdale each gave plaintiff a score of nine and Andrews, respectively, scores of ten, ten and nine.  The substance of their answers is similar. On questions two and three, Casey, Gies and Dunderdale all gave plaintiff and Andrews scores of ten.  The substance of their answers to questions two and three tracked the model answers.

On question four, however, Casey, Gies and Dunderdale respectively gave plaintiff scores of six, five and six.  They each gave Andrews a score of ten.  Question four asked candidates what they would do if an employee asked "how to obtain time off to attend a parent teach[er] conference" and "[w]hat steps must be taken" to obtain approval.  (Docket Entry ## 37-2, pp. 77, 92).  It was one of the questions, along with the model answers,

that Subway Operations submitted to Dunderdale before the interviews. The model "answer is taken directly out of the [MBTA's] Small Necessities Leave Act ('SNLA') Policy." (Docket Entry # 47, ¶ 50) (Docket Entry # 35, ¶ 50) (Docket Entry # 37-2, pp. 103-106). The model answer states that the employee "must complete the SNLA form and submit the form," with "appropriate school documentation," seven days in advance of the requested day off. (Docket Entry # 37-2, p. 73) (Docket Entry # 47, ¶ 50) (Docket Entry # 35, ¶ 50). The SNLA additionally notes that employees may use 24 hours of unpaid leave "in increments of at least two hours" during a calendar year. (Docket Entry # 37-2, p. 104).

All three interview guides show that plaintiff correctly identified the requirements of an SNLA application, proof of the appointment and an approval of the leave. All three guides also show that plaintiff incorrectly answered that three days advance notice is sufficient, leave is taken in four hour increments and an employee receives 12 or 16 hours of leave per year. (Docket Entry # 37-2, pp. 77, 80 and 83). As to Andrews, the three interview guides reflect that he correctly identified the requirements of seven days advance notice, documentation, approval, two hour increments and 24 hours of leave per year. The committee members therefore appropriately awarded Andrews higher scores than plaintiff for question four.

On question five, Casey, Gies and Dunderdale respectively awarded plaintiff scores of eight, eight and seven and Andrews scores of nine, nine and eight.[22] As to question six, Casey, Gies and Dunderdale respectively gave plaintiff scores of six, six and seven and gave Andrews scores of nine. Question six asked each candidate what he or she would do as superintendent "to reduce the Division's budgetary costs without negatively impacting service." (Docket Entry # 37-2, pp. 78, 93). Suggested responses in the model answer included using "the Pick Process to assist with controlling the budget," adjusting the schedule, monitoring "Holiday 'off lists,'" being creative "when performing the list," adhering to "'No-sub' work when possible," improving absenteeism and reducing Green Line trains during holidays if possible. (Docket Entry # 37-2, pp. 73-74). A review of the interview guides reveals that Andrews identified a greater number of these items than plaintiff. (Docket Entry # 37-2, pp. 78, 81, 84, 93, 97, 101). Consequently, Andrews received higher scores than plaintiff on question six.

On question seven, Casey, Gies and Dunderdale respectively gave plaintiff scores of nine, ten and eight. Andrews received slightly lower scores of eight, eight and nine from Casey, Gies and Dunderdale respectively. All three committee members gave

---

[22] The discussion section provides more detail regarding question five.

plaintiff and Andrews identical scores of nine for their answers to question nine.

In sum, plaintiff's and Andrews' answers to questions four and six yielded a 21 point gap in scores. Their answers to question four, an objective question asking about the procedure for obtaining time off for a teacher parent conference with answers set in a written MBTA policy, resulted in the largest gap of 13 points.[23]

On May 23, 2007, each selection committee member signed a document recommending Andrews as Transportation Superintendent. The May 29, 2007 memorandum reflects the selection committee's agreement to award Andrews the position. The memorandum states that the committee awarded Andrews the position "[b]ased on his qualifications and responses to the uniform questions used during the selection process . . .." (Docket Entry # 37-2, p. 69).

On April 20, 2008, OD opened an investigation into plaintiff's claim that the MBTA denied her the promotion because of her race and gender or in retaliation for her involvement in the Junior action. (Docket Entry # 37-4, pp. 21-22). The investigator concluded that plaintiff's race and gender did not play a role in the decision. He also found insufficient evidence that the MBTA violated MBTA policies on harassment and

---

[23] Plaintiff's recitation of what James Harris ("Harris"), a retired MBTA supervisor, told her took place when he was a member of a selection committee is hearsay.

discrimination.  OD closed the file on June 18, 2008.[24]

VI.  <u>2008 Staff Meeting</u>

Plaintiff "transferred to the Green Line two or three months
after [Andrews] became the superintendent on the Line."  (Docket
Entry # 37-3, p. 15) (Docket Entry # 35, ¶ 62) (Docket Entry #
47, ¶ 62).  A staff meeting took place on March 4, 2008, with
Andrews and plaintiff, Quentin Scott, an African Amercian,
Cassino, a white female, and Stephen McKeon ("McKeon"), all
supervisors on the Green Line and members of Andrews' staff at
the time.

At the time of the meeting, Andrews was experiencing
attendance problems among his staff of supervisors.  The staff
consisted "of five or six people" and two supervisors "were out
long term."  (Docket Entry # 37-3, pp. 27-28, 34).  Staff members
are subject to deadlines and, in particular, a 15 day deadline
or, if extended, a 30 day deadline to complete investigations of
attendance policy violations.  If the time period elapsed, the
employee could not be disciplined.  On one occasion, Andrews told
plaintiff that, "[H]e better not be losing disciplines" due to

---

[24]  Plaintiff avers that she did not file "a complaint with
OD regarding being bypassed for the position of [Transportation]
Superintendent."  (Docket Entry # 51, p. 11).  She attests that,
"Another employee, Craig Diaz, took it upon himself to file a
complaint with OD."  (Docket Entry # 51, p. 11).  The findings by
OD regarding *the June 2009 incident* identify the complainant as
Craig Diaz ("Diaz") filing on behalf of plaintiff.  (Docket Entry
# 37-4, p. 53) (Docket Entry # 51-4, p. 21).

the time limits.  (Docket Entry # 51-3, p. 16).

During the March 4, 2008 meeting, Andrews was "yelling and screaming" as well as "pounding on [a] desk."  (Docket Entry # 37-1, p. 32) (Docket Entry # 51-3, p. 13).  In pertinent part, Andrews told the group that:

> I am the superintendent.  I make the final call.  I am the majority.[25]  I am not the complaint department.  Stop cc'ing Debbie (Gies), it will come back to haunt you like a boomerang, [p]roceed at your own peril.

(Docket Entry # 37-1, pp. 33, 34, 37, 38) (Docket Entry # 51-1, p. 14) (Docket Entry # 51, p. 11) (Docket Entry # 51-19).[26]

---

[25]  Plaintiff attests that when Andrews "said, 'I'm the majority,' [plaintiff] believed that he meant he was the white man in charge."  (Docket Entry # 51, p. 12).  In a memorandum to Gies two weeks after the staff meeting, plaintiff stated her belief that the "comment that he was the majority" lead her to believe that the statement was "racially motivated."  (Docket Entry # 37-3, p. 50).

[26]  Except for the statement that, "'I'm not the complaint department,'" (Docket Entry # 37-3, p. 38), the above statements recite plaintiff's testimony under oath of what Andrews said at the meeting.  Andrews does not "recall the boomerang comment." (Docket Entry # 37-3, p. 34).

Ordinarily, statements in a plaintiff's affidavit "about what he was told" are disregarded as inadmissible hearsay and cannot be considered on summary judgment for the truth of the matter asserted.  Hannon v. Beard, 645 F.3d 45, 49 (1st Cir. 2011); see Bhatti v. Trustees of Boston University, 659 F.3d 64, 71 (1st Cir. 2011) (Bhatti's recitation of coworkers' out-of-court statements about scheduling disparities in employment discrimination case is "inadmissible hearsay"). Similarly, unsworn statements in an internal complaint or grievance constitute inadmissable hearsay.  See Bennett v. Saint-Gobain Corp., 507 F.3d 23, 28 (1st Cir. 2007).  Statements by a percipient witness may nevertheless show notice of the retaliatory conduct or "toleration of a general climate of offensive remarks and displays."  Tuli v. Brigham & Women's Hosp., 656 F.3d 33, 41 (1st Cir. 2011); see also Wright v.

During the meeting, Andrews referenced proper "email protocol and obeying the chain of command." (Docket Entry # 37-3, p. 17). He also stated that, "visitors in the office should not come and see [me], because I am the superintendent." (Docket Entry # 37-3, pp. 36-37). Referring to Gies, Andrews' superior, or other MBTA officials, he told the group, "'I am tired of them calling me and complaining that no one answers the phone.'" (Docket Entry # 51-3, p. 14).

Andrews additionally stated that, "'Work doesn't take FMLA, comp or vacation days.'" (Docket Entry # 37-3, p. 31). Specific to plaintiff, he said, "'Andrea[,] attendance doesn't take all day; what you do only takes four hours.'" (Docket Entry # 51-3, p. 14) (Docket Entry # 37-1, pp. 34, 38). In contrast, he complimented Quentin Scott and Cassino. (Docket Entry # 35, ¶

---

Southland Corp., 187 F.3d 1287, 1303-1304 & n.21 (11th Cir. 1999) (statements in age discrimination case "not being offered to prove the truth of the matters asserted (e.g., that Wright was too old to operate Southland's computers), but rather to prove the state of mind of the decisionmakers"); Staniewicz v. Beecham, Inc., 687 F.2d 526, 530-531 (1st Cir. 1982); see also Hatfield-Bermudez v. Aldanondo-Rivera, 496 F.3d 51, 56 & n.1 (1st Cir. 2007).

Accordingly, the above statements are not considered for the truth of the matter asserted, i.e., that Andrews does make the final call or that he is the majority. See Staniewicz v. Beecham, Inc., 687 F.2d at 530 ("[a]ppellee correctly argues that these statements and the notes supporting them were not hearsay as defined by Fed.R.Evid. 801(c), because they were not offered for the truth of the matter asserted therein"). Instead, the statements are considered to show Andrews' state of mind as harboring a discriminatory animus or toleration of a workplace environment of offensive remarks.

72) (Docket Entry # 47, ¶ 72) (Docket Entry # 37-1, p. 34).

Andrews does not remember whether Cassino, McKeon, Quentin Scott or plaintiff was one of the individuals that "cc'd [Gies] a lot." (Docket Entry # 37-3, pp. 20-21). Plaintiff avers that she "would often cc [Gies] as well as" OD. (Docket Entry # 51, p. 11). Gies testified that "everybody" or "all the supervisors" were "cc'ing" her. (Docket Entry # 37-2, pp. 45-47).

By affidavit, Quentin Scott described the staff meeting as a discussion of issues that "directly affected the Green Line." (Docket Entry # 37-4, p. 16). McKeon described Andrews' conduct as "professional and courteous" at the meeting. (Docket Entry # 37-4, p. 17). Cassino likewise averred that, "Andrews was never discourteous or disrespectful to anyone" at the meeting. (Docket Entry # 37-4, p. 18).

After the staff meeting, plaintiff left work and went home sick. (Docket Entry # 35, ¶ 73) (Docket Entry # 47, ¶ 73) (Docket Entry # 37-1, p. 38). "[S]he was aggravated and frustrated at what she believed was the 'behavior of people at this company to minorities' that was 'disheartening, embarrassing and tolerated.'" (Docket Entry # 35, ¶ 73) (Docket Entry # 47, ¶ 73) (Docket Entry # 37-1, pp. 37-38).

On March 6, 2008, Andrews wrote a memorandum to Gies describing the staff meeting. On March 17, 2008, plaintiff submitted a memorandum to Gies captioned, "Civil Rights complaint

against Superintendent Andrews." (Docket Entry # 37-1, p. 48). The memorandum complained about Andrews' conduct and statements at the meeting.[27] The unsworn memorandum alleges that she "was publicly humiliated and placed in an environment plagued with retaliation, hostility, threats and promises."[28] (Docket Entry # 37-3, p. 48). Upon receiving the memorandum, Gies forwarded it to her superiors.

By letter dated March 25, 2008, OD informed plaintiff that it had received a copy of the memorandum. The letter asked plaintiff to contact the office to schedule an interview. Plaintiff emailed the office that she did not have any further

---

[27] The memorandum asserts that Andrews made the following statements:

> With the two that are out now I am taking it personal. Watch your tones on the telephone. I AM THE SUPERINTENDENT. I MAKE THE FINAL CALL. I AM THE MAJORITY. I AM NOT THE COMPLAINT DEPARTMENT. Stop cc'ing Debbie (Gies) and other people[.] IT WILL ONLY COME BACK AND HAUNT YOU, LIKE A BOOMERANG PROCEED FORWARD WITH YOUR OWN PERILS. I need a cooperative effort by all and communication is key. Visitors to the office should not come and see me[.] I AM THE SUPERINTENDENT[.] [F]ind out why the need me and help them. I only want emergencies, everything else handle down the hall. Always answer the telephone when you see Debbie, OCC and clinic calling. I am tired of them calling me and complaining that no one answers the phone.

(Docket Entry # 37-3, pp. 48-49). As previously explained, unsworn statements in internal grievances are hearsay. See Bennett v. Saint-Gobain Corp., 507 F.3d at 29 ("Porter's grievance was unsworn, her narrative about Feagans's comments comprised hearsay within hearsay and, thus, confronted a doubled hearsay bar").

[28] See the previous footnote.

information beyond the information in the complaint sent to Gies. Plaintiff previously filed at least one complaint against an OD investigator, June Castle ("Castle"), for failing to conduct a thorough investigation.

On March 31, 2008, OD opened an investigation into the incident. The investigator interviewed a number of witnesses and reviewed various documents. In a lengthy decision, he found that plaintiff was not subjected to a hostile work environment based on race. He also issued a no cause finding regarding plaintiff's allegation that Andrews violated MBTA policies on harassment and discrimination.

Also on March 31, 2008, plaintiff filed a complaint against the MBTA with MCAD. Plaintiff alleged she was not selected for the Transportation Superintendent position because of her race, gender and participation in the Junior action. (Docket Entry # 35, ¶ 78) (Docket Entry # 47, ¶ 78) (Docket Entry # 51-15, pp. 9-19).

In the same MCAD complaint, plaintiff complained about the March 4, 2008 staff meeting and named Andrews as a respondent. (Docket Entry # 35, ¶ 79) (Docket Entry # 47, ¶ 79) (Docket Entry # 51-15, pp. 9-19). The complaint includes the March 17, 2008 memorandum to Gies and Andrews' purported statement on February 28, 2008, that he "'better not be losing disciplines.'" (Docket Entry # 51-15, pp. 10, 17). The MCAD allowed plaintiff leave to

amend the complaint to include the June 2009 incident. (Docket Entry # 37-4, pp. 34, 37) (Docket Entry # 51-11, pp. 12-17).

The MCAD issued an Investigative Disposition in December 2009. (Docket Entry # 35, ¶ 83) (Docket Entry # 47, ¶ 83) (Docket Entry # 37-4, pp. 34-39). In a five page, single spaced opinion, the investigator found insufficient evidence to find Andrews liable and no probable cause for any of the charges. (Docket Entry # 35, ¶ 83) (Docket Entry # 47, ¶ 83) (Docket Entry # 37-4, pp. 34-39).

VII. <u>Toy Truck Incident</u>

When plaintiff arrived at the Green Line, she had her own office in a building that contained the office of the Transportation Superintendent and a large office shared by a number of other supervisors. Plaintiff kept her private office throughout the relevant time period. At some point in time prior to June 2009, a number of supervisors, including Cassino, moved to a different building. McKeon already had an office in the same building. In June 2009, he shared an office with Cassino.

By June 2009, Andrews was no longer plaintiff's boss. Rather, Quentin Scott, who is an African American, was plaintiff's boss. He worked in the office vacated by Andrews in the same building as plaintiff's office.

Plaintiff's job included conducting interviews of MBTA employees "for possible discipline." (Docket Entry # 37-1, p.

46).  On June 2, 2009, she was in her office conducting an interview.  (Docket Entry # 37-1, pp. 42-43).  During the interview, she had to retrieve something she knew would be in Cassino's office in the next building.  (Docket Entry # 37-1, pp. 42, 54).  When she went to retrieve the item from the next building, she saw "a toy truck with a gorilla character, like, action figure" and "a black man in a suit hanging out of the back of the truck" on Cassino's desk.[29]  (Docket Entry # 37-1, p. 49).  The black man was in the truck bed and the gorilla was "in the driving compartment."[30]  (Docket Entry # 37-1, p. 50).  They were not sitting next to each other.  Plaintiff described the gorilla as a "kid's action figure" and the gorilla and the truck as "like a toy."  (Docket Entry # 37-1, p. 50).

In addition to the toy truck with the gorilla and the black man, plaintiff saw "office stuff" such as pens, paper, stapler, a tape dispenser and a computer.  (Docket Entry # 37-1, p. 52).  Plaintiff had never seen the truck and figures on Cassino's desk before June 2, 2009, and had no idea how the items appeared on the desk.

---

[29]  Plaintiff's reliance on her description of what she saw set out in the motion to amend the MCAD complaint (Docket Entry # 51-11, pp. 13-14) is misplaced.  The document is not sworn and is analogous to the unsworn grievances the First Circuit in Bennett v. Saint-Gobain Corp., 507 F.3d at 28, characterized as hearsay.

[30]  Plaintiff also testified that, "The black man could have been in the front" of the truck.  (Docket Entry # 37-1, p. 50).

Plaintiff became "very angry and upset."  (Docket Entry #
51-4, p. 22).  She immediately took a picture of the truck and
the figures.  She may have started crying at which point two MBTA
employees came over to try to console her.  (Docket Entry # 37-1,
p. 55).  She considered the figures racist:

> because historically African Americans have been negatively
> depicted as gorillas or apes, and to see something like
> this, on a [desk of a] white woman with no [sic] complaints
> for being racist in her ten years, this was another way of
> showcasing what and how she felt.  So the fact that this was
> on her desk and it was a black man with a gorilla in the
> back of the truck, it was appalling to me.

(Docket Entry # 51-4, p. 22).  Plaintiff was humiliated and
shocked by the incident.  At her August 2013 deposition,
plaintiff likened the feeling as the same one she experienced
more than five years before when two local sportscasters were
laughing on the radio about a gorilla escaping from a zoo and
referring to the gorilla "as a METCO kid waiting for the bus."
(Docket Entry # 51-4, pp. 22-24).  Plaintiff eventually returned
to her office, completed the interview, went home at the
conclusion of the work day "and then went out sick."  (Docket
Entry # 37-1, p. 58).

Gies, who was "very good friends" with Cassino, first saw
the truck and figures when she was called into Quentin Scott's
office.  (Docket Entry # 51, p. 12) (Docket Entry # 51-12, pp.
21-22).  Gies recognized the black man as a character from "Lilo
& Stitch," a children's movie.  She described the black man with

45

the tie as "a character from the movie, an action item." (Docket Entry # 51-12, p. 29). Neither Gies, Cassino's supervisor, nor "anyone else at the MBTA" disciplined Cassino for the incident. (Docket Entry # 51, p. 12).

At her deposition, plaintiff testified that Spencer "complained about African Americans . . . being treated differently on the Green Line" by Cassino and Gies. (Docket Entry # 51-4, pp. 24-25). Spencer received a monetary award from the MCAD for "one of the complaints he filed." (Docket Entry # 51-4, pp. 26, 28). DiManche also filed "complaints against either" Gies or Cassino about being treated "differently because she was an African American female."[31] (Docket Entry # 51-4, p. 27). Plaintiff believes that the MCAD awarded DiManche money in connection with one or more of the complaints. Plaintiff did not identify the time period during which these individuals filed their complaints

Cassino and plaintiff "were always professional" to each other before the incident. (Docket Entry # 37-1, p. 57). Plaintiff had spent a significant amount of time training Cassino and had no reason to file an OD complaint against her before the

---

[31] Plaintiff's additional testimony that Seisay told her that Cassino or Gies "spoke to him differently" and "talked down to him" is hearsay or double hearsay. (Docket Entry # 51-4, p. 28). Plaintiff does not recall witnessing any of the disparate or discriminatory incidents by Gies or Cassino against Seisay, DiManche and/or Rameaux. (Docket Entry # 51-4, p. 29).

incident.  (Docket Entry # 37-1, pp. 53, 57-58).  Plaintiff never saw or heard Cassino say or do anything that plaintiff believed was discriminatory.

Andrews, who was not involved in the incident but found out about it "from the news," testified he would "find something like" the figures offensive.[32]  (Docket Entry # 49-1, p. 10).  He thought the toy was offensive because "[i]t appears to insinuate that there's a correlation between a gorilla and a black man in a suit." (Docket Entry # 49-1, p. 11).

On June 2, 2009, Diaz filed a complaint on plaintiff's behalf with OD based on racial harassment.[33]  OD opened an investigation into the incident on the same day.  In an unsworn memorandum dated June 3, 2009, Quentin Scott informed Gies about the incident.  On June 3, 2009, Cassino and McKeon each sent short, unsworn incident reports about the matter to Quentin Scott.[34]  On June 22, 2009, another supervisor sent a short letter describing the incident to Beverly Gudanowski, an assistant director at OD who conducted the investigation.  OD closed the investigation on June 29, 2009, with a finding of no

---

[32]  Even if this court considered Andrews' testimony, it would not alter the recommendation on the summary judgment motion with respect to the toy truck incident.

[33]  See footnote 24.

[34]  These reports are not considered for the truth of what Cassino and McKeon state took place.  Rather, they are considered as evidence that Quentin Scott investigated the incident.

probable cause.

OD issued extensive findings and recommendation regarding the incident. The 13 page, single spaced findings exhaustively detail the incident from the viewpoints of various witnesses. As previously noted, the MCAD allowed plaintiff to amend the complaint filed in March 2008 to include the June 2, 2009 toy incident and the agency issued a finding of no probable cause.

DISCUSSION

I. <u>Denied Promotion</u>

Plaintiff submits that the MBTA's denial of the promotion in 2007 was both discriminatory on the basis of her race and gender and retaliatory on the basis of her testimony in the Junior action and her activities with Ward. Defendants seek summary judgment because the conduct was neither discriminatory nor retaliatory.

A. <u>Race and Gender Discrimination</u>

Where, as here, there is no direct evidence of discrimination, courts use the familiar, analytical framework outlined by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-805 (1973), and <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248, 252 (1981). Under this framework, the plaintiff bears the initial burden to establish the elements of a prima facie case. <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. at 802. This minimal showing functions

to raise an inference of discrimination.  <u>Texas Department of</u>
<u>Community Affairs v. Burdine</u>, 450 U.S. at 253-254.  The burden of
production then shifts "to the employer to articulate some
legitimate, non-discriminatory reason" for the employment action.
<u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. at 802.  If the
defendant succeeds, the plaintiff is afforded a "fair opportunity
to show that [defendants'] stated reason" is a pretext.  <u>Id.</u> at
804.  Throughout, "the plaintiff bears the 'ultimate burden of
persuading the trier of fact that the defendant intentionally
discriminated against the plaintiff.'"  <u>Gu v. Boston Police</u>
<u>Dept.</u>, 312 F.3d 6, 11 (1st Cir. 2002) (quoting <u>Burdine</u>, 450 U.S.
at 253).

On summary judgment, the question reduces to whether
plaintiff has "adduced the requisite evidence to permit a jury to
find that his race" or gender "played a motivating role in the
decision to bypass him for promotion." <u>Ahmed v. Johnson</u>, 752
F.3d at 503; <u>see</u> <u>Pearson v. Massachusetts Bay Transportation</u>
<u>Authority</u>, 723 F.3d 36, 40 (1st Cir. 2013) (employee avoids
summary judgment by raising genuine factual issue that the
adverse action "'was motivated by . . . discrimination'");
<u>Acevedo-Parrilla v. Novartis Ex-Lax, Inc.</u>, 696 F.3d 128, 147 (1st
Cir. 2012) (reversing summary judgment for employer because
employee's proffer was "sufficient to raise a genuine issue of
material fact as to whether discrimination motivated the adverse

employment action"). "In a proper case, the trier of fact may infer the ultimate fact of discrimination from components of the plaintiff's prima facie showing combined with compelling proof of the pretextual nature of the employer's explanation." <u>Rathbun v. Autozone, Inc.</u>, 361 F.3d 62, 72 (1st Cir. 2004); <u>accord</u> <u>Ahmed v. Johnson</u>, 752 F.3d at 498; <u>see</u> <u>also</u> <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 147 (2000) ("[p]roof that" an employer's "explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive").

In other cases, a showing of pretext does "not inevitably reveal discrimination" but, combined with additional evidence, suffices to show discrimination and thereby avoid summary judgment. <u>See</u> <u>Ahmed v. Johnson</u>, 752 F.3d at 498; <u>accord</u> <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. at 146 ("factfinder's rejection of the employer's legitimate, nondiscriminatory reason for its action does not *compel* judgment for the plaintiff"). "The ultimate question" remains "whether the employer intentionally discriminated, and proof that 'the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason is correct.'" <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. at 146 (ellipses omitted).

Where, as here, the matter involves a denied promotion, a

prima facie case requires plaintiff to show that: (1) she "is a member of a protected class," (2) she "was qualified for the open position," (3) she "was denied the position, and (4) the position was given to someone with similar or inferior qualifications." Ahmed v. Johnson, 752 F.3d at 496. In the case at bar, defendants concede that plaintiff presented a prima facie case. (Docket Entry # 42). The burden of production therefore shifts to defendants to articulate a legitimate, nondiscriminatory reason. Pearson v. Massachusetts Bay Transp. Authority, 723 F.3d at 40.

Defendants easily satisfy this burden. Hiring "the most qualified and appropriate person" for a position satisfies the employer's burden to show a legitimate explanation for its action. Gu v. Boston Police Dept., 312 F.3d at 12. Defendants point out, correctly, that Andrews outscored plaintiff during the interview phase of the process. Hence, plaintiff was not promoted because she did not receive the highest interview score.

With the production of a legitimate nondiscriminatory reason, the McDonnell Douglas framework disappears making it incumbent upon plaintiff to provide minimally sufficient evidence of both pretext and discriminatory animus to avoid summary judgment. See Pearson v. Massachusetts Bay Transp. Authority, 723 F.3d at 40 ("Pearson must offer 'some minimally sufficient evidence, direct or indirect, both of pretext and of MBTA's

discriminatory animus'") (internal brackets and emphasis omitted); accord Ahmed v. Johnson, 752 F.3d at 497 ("question becomes whether a reasonable jury could find that the Department's proffered reason is pretextual and that Ahmed was in fact denied the promotion because of his religion, race, or national origin"); Velez v. Thermo King de Puerto Rico, Inc., 585 F.3d 441, 452 (1st Cir. 2009) (plaintiff "'must elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real and unlawful motive of discrimination'") (quoting Azimi v. Jordan's Meats, Inc., 456 F.3d 228, 246 (1st Cir. 2006), and omitting internal brackets).  In determining pretext, the focus is "'on the perception of the decisionmaker, that is, whether the employer believed its stated reason to be credible.'" Velez v. Thermo King de Puerto Rico, Inc., 585 F.3d at 452 (quoting Azimi v. Jordan's Meats, Inc., 456 F.3d at 246), and omitting internal quotation marks and citations).

Circumstantial evidence of pretext may include "evidence of differential treatment, evidence of discriminatory comments, statistical evidence, and comparative evidence." Rathbun v. Autozone, Inc., 361 F.3d at 72; Webber v. International Paper Co., 417 F.3d 229, 234 (1st Cir. 2005) (quoting Rathbun, 361 F.3d at 72).  "'[W]eaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered

legitimate reasons'" which allow a factfinder to "'infer that the employer did not act for the asserted non-discriminatory reasons'" also provide a means to establish pretext. Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 56 (1st Cir. 2000).

Plaintiff proffers a number of arguments to show that the MBTA's stated reason for promoting Andrews and not plaintiff was a pretext for race or gender discrimination. First, plaintiff asserts that pretext exists because "two of the three individuals making the decision [that is by scoring the interview candidates] had complaints of racial discrimination filed against them by MBTA employees including the chairperson of the interview team." (Docket Entry # 46) (brackets in original). Plaintiff also points out that "the chair of the committee had had a racial discrimination claim filed against her by the plaintiff." (Docket Entry # 46).

The references in the summary judgment record that plaintiff cites to establish the latter fact[35] show that plaintiff refers to the 2004 internal complaint plaintiff filed with OD against Dunderdale about being bypassed for the promotions to the AFC Smart Card Program Manager and Assistant Director for AFC

---

[35]  Plaintiff cites to page 57 of Dunderdale's deposition (Docket Entry # 51-1, p. 19), pages 573 to 579 of plaintiff's deposition (Docket Entry # 51-4, pp. 9-15) and exhibits 13, 14 and 15 (Docket Entry # 51-5, pp. 1-9).

Operations Installation positions.  Plaintiff also filed an attachment to the union grievance in 2004 against Dunderdale and the MCAD complaint in 2004.[36]  At an undetermined time, Junior filed a complaint against Dunderdale.  (Docket Entry # 51-1, p. 19).  Thus, almost three years elapsed between the time plaintiff filed the complaints against Dunderdale and the time Dunderdale chaired the selection committee for the May 2007 promotion.  There is no showing that the grievances were successful or the investigative findings issued evidencing that Dunderdale engaged in unlawful discrimination.[37]  In the meantime, there is little, if any, indication that Dunderdale and plaintiff interacted negatively from January 2005 to April 2007 when plaintiff applied for the promotion.[38]  In addition, plaintiff received a promotion to supervisor in 2005.[39]

The fact that Dunderdale may have told Andrews the names of the selection committee members does not evidence pretext let alone discrimination.  See generally Barry v. Moran, 661 F.3d 696, 708 (1st Cir. 2011) ("employment decision motivated by

---

[36]  See footnote 12 and related text.

[37]  See footnote nine.

[38]  Plaintiff did testify at the July 2006 deposition in the Junior action.

[39]  Plaintiff points out that Scott, a black female, chaired the selection committee for the 2005 promotion.  Without more, this does not show racial bias on the part of Dunderdale.

cronyism, not discrimination, would be 'lawful, though perhaps unsavory'"). In short, the complaints filed by plaintiff against Dunderdale slightly less than three years before the denied promotion do not, without more, raise a factual issue of pretext or discrimination.

As to the complaints made by DiManche, Rameaux, Spencer and Seisay against Gies, plaintiff does not provide the dates or the specifics. By and large, she relies on hearsay of what these individuals told her about filing their complaints. To the extent they are not hearsay, the First Circuit in Gu rejected an argument that a co-workers' complaints about a decisionmaker's mistreatment of women showed pretext. See Gu v. Boston Police Dept., 312 F.3d at 13. As aptly and cogently reasoned in Gu:

> Viewing this evidence in the light most favorable to plaintiffs, it raises the possibility that McGough treats women differently. However, it does nothing to rebut the facts that (1) neither plaintiff met the basic requirements for the MM-8 position; (2) Walter met the job requirements for that same position; and (3) McGough simply followed office tradition in naming the second-highest ranking employee as Deputy Director.

Id. (affirming summary judgment for employer in promotion case). Here too, the factually nonspecific MCAD complaints that Spencer and DiManche made against Gies and the complaints made by Rameaux and Seisay do not raise a genuine issue of fact that discrimination motivated Gies to score Andrews higher than plaintiff in May 2007.

Plaintiff's remaining pretext arguments are that: (1) the

selection committee members did not write down the candidates'
complete answers to the interview questions;[40] (2) the process
was subjective;[41] (3) plaintiff had more supervisory experience
and education than Andrews; (4) the top four candidates who
scored higher than plaintiff were white males; (5) the selection
committee did not include a member of OD; and (6) in 1997, after
a history of race and gender discrimination, the MBTA entered
into the 1997 agreement with the Attorney General and in 1998 the
Attorney General issued a report that the MBTA was not abiding by
the agreement.  (Docket Entry # 46).

       The first two arguments do not provide a basis to infer
pretext or discrimination.  The answers the three committee
members wrote in plaintiff's and Andrews' interview guides are
all uniform in substance regarding how plaintiff and Andrews
answered each question.  Plaintiff does not provide any evidence
that she answered the questions differently from what the
committee members recorded on the interview guides.[42]  She only
provides facts that show that Gies wrote two additional pages of

_____

       [40]  Plaintiff's argument that Dunderdale "corrected" the
answers of Gies and Casey (Docket Entry # 46) is factually
inaccurate as discussed in the background section.

       [41]  Plaintiff's evidence to support this assertion is that
Casey testified that the scoring process was "kind of subjective"
and Gies testified that, "I guess there's a little subjectivity,
yes."  (Docket Entry # 51-12, p. 27) (Docket Entry # 50, p. 18).

       [42]  She testified that she could not recall her answers to
the interview questions.

notes to record Andrews' answers and various committee members
recorded the salient points or not every word of the answers.

Furthermore, the interview questions are race and gender
neutral. Each question sought identifiable information about the
position or information contained in MBTA policies or procedures.
The seven model answers are specific and unbiased. Andrews'
answers to questions four and six matched the model answers to a
significantly greater degree than plaintiff's answers to these
questions. In accordance with the selection policy, the
questions were predetermined and each committee member asked the
same questions in the same order to each candidate. The guides
contained a score key describing the applicable numerical scores.
Such a structured interview process is usually designed to be
objective, <u>see</u> <u>Arroyo-Audifred v. Verizon Wireless, Inc.</u>, 527
F.3d at 218 (noting that "'structured interview,' wherein all
candidates would be asked the same questions by interviewers[,] .
. . is designed to be objective, as there are specific subjects
to be covered and responses deemed acceptable"), and it was
objective in the case at bar. <u>See</u> <u>also</u> <u>Brooks v. Ameren UE</u>, 345
F.3d 986, 988 (8th Cir. 2003) (affirming summary judgment in part
because "interviewers were able to explain, in clear and
reasonably specific terms, their reasons for scoring Brooks lower
than the promoted candidates").

Turning to the third argument, plaintiff had more education

and more supervisory experience than Andrews. In accordance with the existing selection policy, the MERs phase took into account plaintiff's education and experience. The selection policy however does not afford extra points, as it did in the past, to education once a candidate satisfied the MERs for a position. As a result, the policy widened the pool of applicants for MBTA positions. Plaintiff received a promotion in 2005 under the same selection policy. As a result of the MBTA's pre-application decision to consider education and supervisory experience during the MERs phase, plaintiff's reliance on her superior education and experience does not infer pretext. See Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 270 (4th Cir. 2005) (because defendants based "promotion decision on the core and functional competencies listed in the job description and not on the educational levels of applicants," plaintiff "cannot rely on her educational background to establish" pretext). In any event, during the interview phase, she had the opportunity to highlight her supervisory experience in answering question seven and she received a total score for the question (27) that was higher than Andrews' total score (25).

The fourth argument focuses on the racial makeup of the selection committee and the scoring of white candidates. Dunderdale, Gies and Casey, who were all white, scored four of

the six white male candidates higher than plaintiff.[43]  On the
other hand, Dunderdale screened out seven of the 13 white male
candidates during the MERs phase.

First, the racial make up of a selection committee is not
the focal point of the pretext analysis.  Rather, it is the
motivation of the committee members regarding their decision to
deny plaintiff the promotion.  <u>See</u> <u>generally</u> <u>Velez v. Thermo King
de Puerto Rico, Inc.</u>, 585 F.3d at 452 (focus is decisionmaker's
perception and whether "'employer believed its stated reason to
be credible'").

Second, because of the uncontroverted independent evidence
that no discrimination took place, the fact that the committee
scored four white candidates higher than plaintiff does not infer
pretext.  When a plaintiff only makes a weak showing raising
doubts about the employer's proffered reasons and there is
"abundant and uncontroverted independent evidence that no
discrimination had occurred," the employer is entitled to
judgment as a matter of law.  <u>Reeves v. Sanderson Plumbing
Products, Inc.</u>, 530 U.S. at 148.  A "slight suggestion of pretext
. . . , absent other evidence from which discrimination can be
inferred," does not meet a plaintiff's ultimate burden and

---

[43]  Other than Andrews' interview guides, plaintiff does not
provide the interview guides for the three white male candidates
who scored higher than plaintiff.  Consequently, it is difficult
to make a comparison of their answers to the model answers.
Plaintiff bears the underlying burden to provide minimally
sufficient evidence of pretext and discriminatory animus.

warrants summary judgment in favor of the employer.  <u>Zapata-Matos</u>
<u>v. Reckitt & Colman, Inc.</u>, 277 F.3d 40, 47 (1st Cir. 2002)
(citing and relying on <u>Reeves</u>, 530 U.S. at 148); <u>see</u> <u>also</u>
<u>Kosereis v. Rhode Island</u>,  331 F.3d 207, 215-216 (1st Cir. 2003).
At most, the all white selection committee and its scoring of
white candidates, notwithstanding Dunderdale's rejection of seven
white male candidates during the MERs phase, raises a very slight
and ultimately deficient inference that the selection committee
scored plaintiff lower because of race discrimination.[44]

As indicated above, the objective and independent evidence
reveals that the selection committee adhered to a predetermined
selection process designed to implement the stated policy of "a
competitive, merit-based process" that "ensures that applicants
and employees are treated fairly without regard to" race and
gender.  (Docket Entry # 37-2, p. 16).  The predetermined
questions were race and gender neutral.[45]  Examining the
substance of the answers Andrews and plaintiff gave in comparison

---

[44]  As to gender discrimination, the fourth argument is not
persuasive.  Two of the three selection committee members were
female and they scored plaintiff, the only female to satisfy the
MERs, near the middle of the group.

[45]  The questions include the following:  "Name Seven (7)
vital records that are required to be filed in a district"; "What
actions do you take when MBTA Medical Services contacts you and
informs you that an operator involved in a post accident tested
positive"; "Please explain the four (4) tracks of the Discipline
Policy and how discipline is imposed"; and "What action do you
take" when "[a] Station Official informs you that a Motorperson
signing in for duty appears to be impaired."  (Docket Entry # 37-
2, pp. 73-74, 76-78).

to the model answers reveals that the committee awarded each candidate appropriate scores under the score key.

Turning to those answers, Andrews and plaintiff gave similar answers and received similar scores except for questions four and six.  For example, they answered questions two and three in the same manner and in accordance with the model answers.  Each question sought identifiable information contained in MBTA policies or procedures.  Andrews and plaintiff each received the highest score of ten from all three committee members.

Andrews' answer to question five, which asked what actions he would take when an "[o]fficial informs you that a Motorperson" appears impaired," identified most of the appropriate steps set out in the model answer.  (Docket Entry # 37-2, p. 77).  Accordingly, he received scores of nine, nine and eight.  Plaintiff's answer was not as complete and did not identify as many of the steps.  Consequently, she received slightly lower scores of eight, eight and seven.  The factual background depicts Andrews' and plaintiff's answers to questions four and six and explains the objective basis for the committee members to score Andrews higher than plaintiff.

Question seven allowed plaintiff to highlight her superior education and experience.  As a result, she received a slightly higher score than Andrews from the committee.

Question eight asked Andrews and plaintiff to explain the

four different tracks of discipline at the MBTA.  The model answer listed the name of each track and the increasing number of days for suspensions at each step within each track.  Andrews and plaintiff identified the four tracks.  Whereas Andrews correctly listed the number of days of a suspension at each level within each track, plaintiff answered the days of a suspension within one track incorrectly.  Her answer otherwise corresponded to the model answer.  Andrews' scores of eight, eight and eight were therefore higher than plaintiff's scores of six, seven and seven.

Question nine asked the candidates about the MBTA's prevention of harassment policies and their responsibilities to carry out these policies.  It also required the candidate to explain unacceptable behaviors.  Andrews and plaintiff both identified the MBTA's zero tolerance policy, OD referrals and complaints as well as proper monitoring and correction of behavior.  Accordingly, the committee members awarded plaintiff and Andrews the same scores.  (Docket Entry # 37-2, pp. 78, 81, 84, 93, 97, 101).

These and other facts provide strong evidence that the selection committee's reason for hiring Andrews, i.e., that he scored higher than plaintiff on the interview phase and was therefore the more qualified candidate, was not a pretext for race or gender discrimination.  Given the abundant independent evidence that no discrimination occurred, the fact that the three

selection committee members were white and scored four white male candidates higher than plaintiff does not infer that the committee's reason was pretextual or that race discrimination played a motivating role in the decision to deny plaintiff the promotion. See Somerville v. William Beaumont Hospital, 373 F.Supp.2d 702, 706 (E.D.Mich. 2005) (allowing summary judgment and rejecting argument that all white grievance committee "provided sufficient evidence to demonstrate that discrimination [was] the true reason for" the termination).

Indeed, a plaintiff's inability to answer objective interview questions accurately in comparison to a chosen candidate renders a plaintiff unable to establish a prima facie case due to the absence of qualifications similar to those of the chosen candidate. See Prescott v. Higgins, 538 F.3d 32, 40 (1st Cir. 2008) (upholding summary judgment in favor of employer). The interview in Prescott "focused on three main criteria: job knowledge, education, and experience." Id. at 38. The entirety of the court's reasoning to support this finding is that:

> Prescott was unable to demonstrate to the satisfaction of the interview panel that he was qualified for the position, and he failed to accurately answer the questions that the panel posed to him during his interview. His answer to several of the questions was that he was "not sure." In contrast, Ryder was able to provide correct answers to each question, and he had ten years more seniority than Prescott.

<u>Id.</u> at 40.[46]  Similarly, the First Circuit in <u>Goncalves</u> upheld summary judgment in favor of the employer because the plaintiff failed to show she was similarly situated to the chosen candidate in part because she received lower marks for the interview and "was one of the lowest scorers on the practical exam." <u>Goncalves v. Plymouth County Sheriff's Dept.</u>, 659 F.3d 101, 107 (1st Cir. 2011).  Evidence sufficient to establish a prima facie case combined with compelling proof of pretext may allow plaintiff to avoid summary judgment.  <u>See</u> <u>Rathbun v. Autozone, Inc.</u>, 361 F.3d at 72.  Here, the opposite exists.  Even though defendants concede the existence of a prima facie case, the evidence to support the fourth element of a prima facie case is decidedly weak.  The fourth argument fails to provide a basis for summary judgment.

In the fifth argument, plaintiff maintains that the selection committee did not include a member of OD.  The selection policy instructs that the committee "shall" include representatives from the hiring department and human resources. (Docket Entry # 37-2,, p. 17).  In 2007, the standard practice was to have an individual from OD sit "in on the interviews." (Docket Entry # 51-1, p. 7).

It is well settled that "'pretext can be demonstrated

---

[46]  The hiring committees in <u>Prescott</u>, a race discrimination case, consisted of two white males, one white female and one African American male.  The chosen candidate was a white male.

through a showing that an employer has deviated inexplicably from one of its standard business practices.'" Adamson v. Walgreens Co., 750 F.3d at 81 (quoting Acevedo-Parrilla, 696 F.3d at 142) (internal quotation marks omitted).  Here, the deviation was not inexplicable.  Dunderdale testified that there was a shortage of representatives from OD at the time of plaintiff's interview. Consequently, she did not believe "it was odd that" an OD representative "was not on the selection committee."  (Docket Entry # 37-1, p. 84).  Plaintiff provides no countervailing evidence to the contrary.

Finally, as to plaintiff's sixth argument, a "'general policy and practice with respect to minority employment' can be significant in assessing discriminatory animus."  Ahmed v. Johnson, 752 F.3d at 503.  The history of the MBTA ten years before the promotion decision however does not infer pretext or race or gender discrimination.  The 1997 agreement and the 1998 report are temporally remote from the 2007 promotion decision. There is little if any showing that the MBTA had a policy or practice in 2007, as opposed to 1997, not to promote black and female employees.

In sum, any slight inference that the selection committee's reason to award the position to Andrews because he had the highest interview score was a pretext for race or gender discrimination disappears in the face of the abundant and

independent evidence that no discrimination occurred. Counts I and II are therefore subject to summary judgment.

B. <u>Retaliation</u>

Plaintiff submits that defendants denied her the 2007 promotion in retaliation for her testimony in the Junior action. (Docket Entry # 46, pp. 15-16). Defendants contend that plaintiff fails to show a prima facie case because there was no temporal relationship between the protected activity and the adverse action.

In order to make a prima facie showing of retaliation, "the plaintiff must show that she engaged in protected conduct, that she suffered an adverse employment action, and that a causal nexus exists between the protected activity and the adverse action." <u>Ponte v. Steelcase Inc.</u>, 741 F.3d 310, 321 (1st Cir. 2014). In the event "the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for its employment decision." <u>Collazo v. Bristol-Myers Squibb Manufacturing, Inc.</u>, 617 F.3d 39, 46 (1st Cir. 2010). If the defendant meets this "burden of production, 'the burden shifts back to the plaintiff to show that the proffered legitimate reason is in fact a pretext and that the job action was the result of the defendant's retaliatory animus." <u>Id.</u> (internal brackets omitted). On summary judgment, the plaintiff must

establish that no reasonable factfinder could conclude she would have been promoted if she had not complained.  See Velazquez-Perez v. Developers Diversified Realty Corp., 753 F.3d 265, 278 (1st Cir. 2014) ("at trial, Velázquez must show that he would not have been fired had he not complained"); see also University of Texas Southwest Medical Center v. Nassar, 133 S.Ct. 2517, 2534 (2013) (but-for causation standard applies to Title VII retaliation claim).

Defendants' temporal proximity argument implicates the third requirement of the prima facie case.  A causal connection sufficient to satisfy the third element of a prima facie case requires evidence of a "very close temporal proximity" between the protected conduct and adverse employment action.  Clark County School District v. Breeden, 532 U.S. 268, 273–274 (2001) (internal quotation marks omitted); Sanchez–Rodriquez v. AT & T Mobility Puerto Rico, Inc., 673 F.3d 1, 15 (1st Cir. 2012) ("[v]ery close temporal proximity between protected activity and an adverse employment action can satisfy a plaintiff's burden of showing causal connection") (internal quotation marks omitted); Collazo v. Bristol–Myers Squibb Manufacturing, Inc., 617 F.3d at 49-50.  Otherwise, temporal proximity "does not by itself establish causality, particularly if the larger picture undercuts any claim of causation."  Ponte v. Steelcase Inc., 741 F.3d at 322 (quoting Wright v. CompUSA, Inc., 352 F.3d 472, 478 (1st Cir.

2003)) (internal quotation marks omitted); accord Garayalde-Rijos v. Municipality of Carolina, 747 F.3d 15, 25 (1st Cir. 2014) ("'temporal proximity' is merely one factor relevant to causation"). The plaintiff must also show that the retaliator knew about the protected activity. See Medina-Rivera v. MVM, Inc., 713 F.3d 132, 139 (1st Cir. 2013) ("employee must show that the retaliator knew about her protected activity—after all, one cannot have been motivated to retaliate by something he was unaware of"); see also Pearson v. Massachusetts Bay Transportation Authority, 723 F.3d at 42 (recognizing that "[k]nowledge alone cannot provide the causal link" and affirming summary judgment in Title VII retaliation case based on third element); Mesnick v. General Electric Co., 950 F.2d 816, 828 (1st Cir. 1991) ("GE knew, at the time Mesnick was dismissed, that he was pursuing an age discrimination claim" but such knowledge, "without more, cannot itself be sufficient to take a retaliation case to the jury").

Plaintiff submits that her testimony in the Junior action "occurred at the same time the [sic] she was interviewed for the position of superintendent of transportation." (Docket Entry # 46). To the contrary, plaintiff's interview took place on May 15, 2007. (Docket Entry # 37-2, p. 76). The selection committee decided to recommend Andrews on May 23, 2007. (Docket Entry # 51-17, p. 7). The trial in the Junior action did not begin until

May 29, 2007.  (Docket Entry # 37-2, p. 8).  The first witness testified on May 30, 2007.  "Causation moves forward, not backwards, and no protected conduct after an adverse employment action can serve as the predicate for a retaliation claim." Pearson v. Massachusetts Bay Transportation Authority, 723 F.3d at 42; accord Trainor v. HEI Hospitality, LLC, 699 F.3d 19, 27 (1st Cir. 2012) (to establish "adverse employment action was caused by an employee's protected activity, the employer's decision to act adversely to the employee must postdate the protected activity").

The protected activity that is the closest in time to the adverse action of denying plaintiff the promotion is therefore the July 2006 deposition.  See 42 U.S.C. § 2000e-3(a) (prohibiting discrimination against employee because he "testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter"). Prior thereto, plaintiff also wrote the March 24, 2004 memorandum which Junior included in the MCAD charge.  See Fantini v. Salem State College, 557 F.3d 22, 32 (1st Cir. 2009) (opposition clause protects informal activities of protest such as "expressing support of co-workers who have filed formal charges").  The ten month time period however is sufficiently large such that, without corroborative evidence, it does not infer a causal connection between the deposition testimony and the denied

promotion.  See Bennett v. Saint-Gobain Corp., 507 F.3d at 32

(gap of 16 months "sufficiently large so that, without some

corroborative evidence, it will not support an inferred notion of

a causal connection") (also citing Mesnick, 950 F.2d at 828, that

nine month gap "undercut any inference of causation").

Here, the larger picture entirely undercuts any claim of

causation.  See Ponte v. Steelcase Inc., 741 F.3d at 322.  As

previously explained, the larger picture includes the application

of an existing selection policy designed to treat all employees

equally without regard to race or gender, the use of

predetermined neutral questions asked to all candidates in the

same manner and a set of model answers.  With respect to two of

those questions, Andrews' answers tracked the model answers more

closely than plaintiff's answers.  Comparing their answers to the

remaining five model answers demonstrates that each selection

committee member scored Andrews' and plaintiff's answers based on

each answer's similarities to the model answer.

Except for chronology, there is a dearth of evidence

indicative of prima facie causation.  Indeed, the MBTA promoted

plaintiff after she wrote the March 24, 2004 memorandum that

Junior included in his MCAD complaint.  There is no indication

that the MBA thwarted plaintiff's efforts to complain internally

or externally to the MCAD about the purportedly discriminatory

treatment she perceived took place.  Given the absence of

sufficient evidence of causation to survive summary judgment, defendants are entitled to summary judgment on the retaliation claim regarding plaintiff's participation in the Junior action.

Defendants also argue that any claim that they retaliated against plaintiff because of her relationship with Ward fails because the selection committee members did not know about the relationship or her involvement in the CME group. As presented, defendants' argument relies exclusively on the absence of knowledge or awareness by selection committee members as opposed to the broader issue of the absence of a causal connection.

As noted above, plaintiff "must show that the retaliator knew about her protected activity." Medina-Rivera v. MVM, Inc., 713 F.3d at 139. "'The term "protected activity" refers to action taken to protest or oppose statutorily prohibited discrimination.'" Fantini v. Salem State College, 557 F.3d at 32. For example, the antiretaliation provision extends to an employee's "repeated efforts to assist a fellow employee" in pursuing an harassment complaint with a "company's Human Resources Department." Collazo v. Bristol-Myers Squibb Manufacturing Inc., 617 F.3d at 42; see Crawford v. Metropolitan Government of Nashville and Davidson County, Tennessee, 555 U.S. 271, 273 (2009) (plaintiff engages in protected activity under opposition clause even though she did not initiate the sexual harassment complaint); Fantini v. Salem State College, 557 F.3d

at 32 (opposition clause protects "informal protests of discriminatory employment practices . . . and expressing support of co-workers who have filed formal charges").

Here, Gies knew Ward's name and "that he has had lawsuits against the MBTA." (Docket Entry # 37-2, p. 41). Although she did not know plaintiff had testified on Ward's behalf, she did know that plaintiff was "part of the case" that Ward brought against the MBTA. In addition, she did not know "what the case was." (Docket Entry # 37-2, p. 43). In short, Gies knew that plaintiff was participating in a lawsuit brought by Ward against the MBTA but she did not know the subject matter of the case.

Circumstantial evidence may provide a basis to infer a retaliator's knowledge of the protected activity. See Medina-Rivera v. MVM, Inc., 713 F.3d at 139 (citing Lewis v. Gillette, Co., 22 F.3d 22, 24–25 (1st Cir. 1994)). Ward was well known as a civil rights advocate at the MBTA. It is therefore reasonable to infer that Gies knew that Ward's case against the MBTA involved civil rights discrimination.[47] Based on the limited argument defendants present, the retaliation count, which alleges retaliation based on plaintiff's activities as to Junior and Ward (Docket Entry # 1, ¶ 31), survives summary judgment as

---

[47] In light of sufficient evidence that Gies, one of the three decisionmakers, was aware of plaintiff's participation in Ward's civil rights discrimination case against the MBTA, it is not necessary to determine if sufficient evidence exists regarding Dunderdale's and Casey's knowledge of such activity.

to Ward but not as to Junior.

## II. Staff Meeting and Toy Truck Incident

Defendants move for summary judgment with respect to Andrews' comments at the March 2008 staff meeting as well as the June 2009 toy truck incident because plaintiff did not experience an adverse employment action. Defendants also maintain that plaintiff does not plead a hostile work environment claim and, in any event, the two incidents do not rise to the level of a hostile environment. Plaintiff asserts that the two incidents "are examples of the systemic racism at the MBTA." (Docket Entry # 46).

A prima facie case of either unlawful retaliation or discrimination requires the plaintiff to experience "an adverse employment action." See Ponte v. Steelcase Inc., 741 F.3d at 321 (prima facie showing of retaliation requires the plaintiff to show inter alia "that she suffered an adverse employment action"); Aly v. Mohegan Council, Boy Scouts of America, 711 F.3d 34, 46 (1st Cir. 2013) (discrimination claim requires the plaintiff to show inter alia that he suffered an adverse employment action). "An adverse employment action 'typically involves discrete changes in the terms of employment, such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits."'" Cham v. Station Operators,

73

Inc., 685 F.3d 87, 94 (1st Cir. 2012) (quoting Morales

-Vallellanes v. Potter, 605 F.3d 27, 35 (1st Cir. 2010)).

Analyzed under "an objective standard," Morales-Vallellanes

v. Potter, 605 F.3d at 35, an adverse "'employment action must

materially change the conditions of the plaintiffs' employ.'"

Cham v. Station Operators, Inc., 685 F.3d at 94 (emphasis

omitted); Gu v. Boston Police Dept., 312 F.3d at 14. "'Work

places are rarely idyllic retreats, and the mere fact that an

employee is displeased by an employer's act or omission does not

elevate that act or omission to the level of a materially adverse

employment action.'" Id. (quoting Blackie v. Maine, 75 F.3d 716,

725 (1st Cir. 1996)).

The record fails to show any material change to plaintiff's

employ that took place at or after the March 4, 2008 staff

meeting or plaintiff's complaints about the incident. The same

is true with respect plaintiff's June 2, 2009 observation and

complaint about the toy truck on Cassino's desk. Summary

judgment on any race or gender discrimination claim based on

these incidents is therefore appropriate. See, e.g.,

Ayala-Sepulveda v. Municipality of San German, 671 F.3d 24, 32

(1st Cir. 2012) (lower court properly awarded summary judgment on

retaliation claim "[b]ecause Ayala did not suffer any adverse

employment action").

Assuming dubiánte that the complaint pleads a hostile work

environment claim, this court turns to the merits of the claim. Racial or gender bias may provide a basis for a hostile work environment claim. <u>See</u> <u>PowerComm, LLC v. Holyoke Gas & Electric Department</u>, 657 F.3d 31, 37 (1st Cir. 2011) ("hostile work environment claims, charging violation of § 1981 or Title VII, can be based on racial bias"); <u>Tuli v. Brigham & Women's Hospital</u>, 656 F.3d 33, 39 (1st Cir. 2011) (stating elements for hostile work environment claim based on gender discrimination). As argued by defendants, to succeed on such a claim, the plaintiff "must establish harassment 'sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment.'" <u>PowerComm, LLC v. Holyoke Gas & Electric Department</u>, 657 F.3d at 37. Relevant factors to consider "may include the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating as opposed to a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance." <u>Aponte-Rivera v. DHL Solutions (USA), Inc.</u>, 650 F.3d 803, 808 (1st Cir. 2011).

The conduct must be "'objectively and subjectively offensive.'" <u>Rosario v. Department of Army</u>, 607 F.3d 241, 246 (1st Cir. 2010); <u>Aponte-Rivera v. DHL Solutions (USA), Inc.</u>, 650 F.3d at 808 (conduct must "create an objectively hostile work environment"). "Whether an environment is 'hostile' or

'abusive'" is "determined only by looking at all the circumstances." <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 23 (1993). Isolated incidents, "'if egregious enough,'" may "'suffice to evince a hostile work environment.'" <u>Ponte v. Steelcase Inc.</u>, 741 F.3d at 320 (quoting <u>Noviello v. City of Boston</u>, 398 F.3d 76, 84 (1st Cir. 2005)).

Examining all of the circumstances regarding the staff meeting, Andrews called the meeting to address workplace issues in light of a shortage of his staff. In the context of identifying a number of work issues, he singled out plaintiff for taking all day to complete a task that should take four hours. Yelling and screaming, he also told the group that he was the superintendent, he made the final call and he was the majority. Two other supervisors attending the meeting considered Andrews' conduct professional and courteous thus indicating that his conduct was not objectively harassing or abusive. Although the attendance comment aimed at plaintiff was humiliating to a degree, it was not physically threatening and it was short lived. By referring to himself as the majority, Andrews did not engage in extreme language. Any inference to race or gender based bias from the "majority" comment is minimal when placed in context. "'[A] supervisor's unprofessional managerial approach and accompanying efforts to assert [his] authority are not the focus of the discrimination laws.'" <u>Colon-Fontanez v. Municipality of</u>

<u>San Juan</u>, 660 F.3d at 44-45 (quoting <u>Lee-Crespo v. Schering-</u>
<u>Plough Del Caribe, Inc.</u>, 354 F.3d 34, 46-47 (1st Cir. 2003)).
Even considering plaintiff's reaction of going home sick as
interfering with her work, overall, a reasonable factfinder would
not find the conduct sufficiently severe or pervasive.

During oral argument, plaintiff acknowledged that her claims
against Andrews concern only the 2008 staff meeting.  Because the
staff meeting does not provide a basis for race or gender
discrimination or retaliation, he is subject to summary judgment.
As discussed below, the IIED claim is barred under the
Massachusetts General Laws chapter 152, section 24 ("chapter
152").

The toy truck incident was brief and did not reoccur.  <u>See</u>
<u>Colon-Fontanez v. Municipality of San Juan</u>, 660 F.3d at 44-45
(affirming summary judgment while characterizing incidents as
"episodic, but not frequent, in nature; upsetting, but not
severe").  Quentin Scott responded immediately and investigated
the matter.  The truck was removed from Cassino's desk.
Plaintiff herself recognized the truck as a toy and described the
gorilla character as "a kid's action figure."  (Docket Entry #
37-1, p. 50).  Gies described the black man as a character from a
children's movie.  The item appeared with other work items on the
desk.  It was not targeted to harass plaintiff because her
presence near Cassino's desk that day was fortuitous.  Except for

this incident, plaintiff "never had a problem" with Cassino and the two interacted with each other in a professional manner. (Docket Entry # 37-1, pp. 56-57). The incident did interfere with plaintiff's work inasmuch as she "went out sick." (Docket Entry # 37-1, p. 58). In light of all the circumstances, including the brevity of the incident and that it involved a child's toy, no reasonable factfinder could find that the incident created a hostile work environment.

Finally, neither incident alone or in combination is egregious enough to evidence a hostile work environment. The kind of isolated incidents that creates a hostile work environment is far more egregious than the incidents in this case. See Ponte v. Steelchase, Inc., 741 F.3d at 320 (collecting cases involving egregious incidents).

III. IIED Claim

Defendants contend that the IIED claim is subject to summary judgment because chapter 152, the Massachusetts Workers' Compensation Act, bars causes of action against an employee's employer or co-worker. Plaintiff invites this court to adopt a theory of recovery resting on "the 'dual persona doctrine.'" (Docket Entry # 46).

Chapter 152, like most workers' compensation laws, "provides the exclusive remedy, in most circumstances, for claims by an injured employee against a covered employer." Roberts v. Delta

78

Air Lines, Inc., 599 F.3d 73, 77 (1st Cir. 2010).  Unless an
employee gives his or her employer written notice waiving a
common law cause of action at the outset of his or her
employment, "employees are 'held to have waived their right of
action at common law in respect to an injury compensable under'"
chapter 152.  Id.  (internal brackets and ellipses omitted); see
Estate of Moulton v. Puopolo, 5 N.E.3d 908, 915 (Mass. 2014)
(although employee may "waive any compensation payments under the
act, an employee so choosing must notify the employer in writing,
at the time of hire, that she does not waive the common-law right
of action").  Plaintiff did not provide such written notice at
the outset of her employment.  Inasmuch as plaintiff sustained
the alleged injuries in the course of her employment at the MBTA,
her employer, the exclusive remedy provision of chapter 152 bars
the IIED claim.  See Estate of Moulton v. Puopolo, 5 N.E.3d at
915 (as long as employee sustained alleged injuries while "acting
in the course of her employment, . . . actions for negligence,
recklessness, gross negligence, and wilful and wanton misconduct
by an employer are precluded by the exclusive remedy provision").

Plaintiff's reliance on the "dual persona" theory as a means
to avoid the exclusivity provision is misplaced.  Under such a
theory, "if an employer's liability to an injured worker derives
from a 'second persona so completely independent from and
unrelated to his status as employer that by established standards

the law recognizes it as a separate legal person,' the employer is not immunized under the workers' compensation law, but is rather regarded as a third party." <u>Gurry v. Cumberland Farms, Inc.</u>, 550 N.E.2d 127, (Mass. 1990) (quoting 2A A. Larson, <u>Workmen's Compensation</u> § 72.80 at 14-229 (1988 ed.)). Chapter 152 "'"was designed to replace tort actions" . . . by providing "a uniform, statutory remedy for injured workers, in contrast to a piecemeal, tort-based system."'" <u>Awuah v. Coverall North America, Inc.</u>, 952 N.E.2d 890, 898 (Mass. 2011) (quoting <u>Saab v. Massachusetts CVS Pharmacy, LLC</u>, 896 N.E.2d 615, 618 (Mass. 2008)). Adopting plaintiff's "dual persona" theory and allowing tort suits by viewing the employer as a split personalty would defeat the purpose of the statute. This court declines the invitation. Because the exclusivity provision of chapter 152 bars the IIED claim, it is subject to summary judgment.

IV.  <u>Motion to Strike</u>

Defendants move to strike certain portions of plaintiff's response to defendants' LR. 56.1 statement as well as certain exhibits. (Docket Entry # 63). Defendants seek to strike the exhibits because plaintiff did not identify them in her initial disclosures or in response to defendants' request for production of documents. Defendants submit that various exhibits are not authenticated and plaintiff did not provide a witness to explain the relevancy of the documents. Defendants also maintain that

the documents "consist of inadmissable hearsay." (Docket Entry # 63).

The motion is moot as to plaintiff's exhibits five and six and the response to paragraph four of defendants' LR. 56.1 statement. Consideration of these exhibits and this paragraph, which pertain to the Junior action, did not alter the recommendation to deny summary judgment on Count III as it pertains to Ward. The remaining recommendations on summary judgment are all in defendants' favor. The same reason renders the challenge to plaintiff's exhibits 11, 14 to 18 and 22 to 24 moot.

Defendants also move to strike exhibit 19. The exhibit is an August 19, 2013 letter from an administrator of the Federal Transit Administration and another administrator from the Federal Highway Administration to the MBTA's General Manager and the Massachusetts Department of Transportation's Secretary addressing possible Equal Employment Opportunity violations. (Docket Entry # 65, p. 19). As explained in plaintiff's opposition, she wishes to use a statement in the letter that reads, "The lack of documentation coupled with the fact that the MassDOT/MBTA received approximately 750 EEO complaints in a recent three year time frame and expended more than $4 million in settlements and legal fees is extremely troubling and disappointing." (Docket Entry # 51-11, p. 3). Plaintiff seeks to submit the unsworn

statement for the truth of the matter asserted, i.e., that there
were 750 EEO complaints in a recent three year time frame and
that the MBTA expended $4 million in settlements, to show that
the MBTA has a history of discriminatory and retaliatory
practices.  Plaintiff also wishes to use the document to rebut
defendants' assertion that the selection policy states that it is
designed to "'ensure that applicants and employees are treated
fairly . . ..'"[48]   (Docket Entry # 65, p. 7).

If used to set out a history of race and gender
discrimination at the MBTA by the fact that the MBTA received 750
EEO complaints and expended $4 million in settlements, it is
hearsay.  "'It is black-letter law that hearsay evidence cannot
be considered on summary judgment.'"  Bennett v. Saint-Gobain
Corp., 507 F.3d at 29 (quoting Dávila v. Corporación De Puerto
Rico Para La Difusión Pública, 498 F.3d at 17) (brackets
omitted).  The statement is not offered to show a state of mind
of discriminatory animus, a reason for making an employment
decision such as a demotion or for another non-hearsay purpose.
See Vazquez-Valentin v. Santiago-Diaz, 459 F.3d 144, 151-152 (1st
Cir. 2006); Staniewicz v. Beecham, Inc., 687 F.2d 526, 530-531
(1st Cir. 1982).  There is little or no evidence that either
administrator has personal knowledge that the MBTA and the

---

[48]  Used for this purpose, the motion to strike the letter is
moot because it would not alter the recommendation to deny
summary judgment as to the retaliation claim regarding Ward.

MassDOT received 750 EEO complaints or has personal knowledge of the settlement amounts or the workplace at the MBTA during the relevant time frame. The statement is not sworn.

It is true, as previously noted, that, "An employer's 'general policy and practice with respect to minority employment' can be significant in addressing discriminatory animus." Ahmed v. Johnson, 752 F.3d at 503. The evidence submitted in Ahmed, however, consisted of affidavits by two longtime employees and by the plaintiff attesting to an absence of minorities in the employer's Boston office and the lack of minority promotions. See id. at 503-504. Insofar as plaintiff seeks to use exhibit 19 to show that the MBTA received 750 EEO complaints in a recent three year time period and expended more than $4 million in settlements and legal fees, it is hearsay and therefore stricken from the record.

Defendants next moves to strike an affidavit by a Supervisor on the Red Line of what a Deputy Chief of the Orange Line said to her about plaintiff. If offered to prove that the Deputy Supervisor made the statement, it is hearsay and stricken from the record. The additional recitation that the Deputy Chief told the affiant one of the questions prior to the May 2007 interview evidences cronyism. As part of the summary judgment record, it does not provide a basis to change the recommendation as to the retaliation count.

Defendants' challenge to exhibit 28 as hearsay is well taken. The exhibit is an affidavit by a former MBTA employee that recites that Morrison told her what the Chief Counsel of the MBTA said to Morrison.

Defendants move to strike 24 responses plaintiff makes in her LR. 56.1 reply to defendants' LR. 56.1 statement. This court considered the responses as argument unless the response properly cited to record evidence in which case this court considered the referenced evidence. The arguments were not convincing. Consequently, plaintiff's violation of the page limit of LR. 7.1(b) was harmless as to defendants and moots the request to strike these paragraphs.

CONCLUSION

In accordance with the foregoing discussion, this court **RECOMMENDS**[49] that the motion for summary judgment (Docket Entry # 33) be **ALLOWED** as to Andrews and as to count I, II and IV as well as the portion of Count III that pertains to retaliation concerning the Junior action. This court **RECOMMENDS**[50] that the

---

[49] Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days of receipt of Report and Recommendation to which objection is made and the basis for such objection. Any party may respond to another party's objections within 14 days after service of the objections. Failure to file objections within the specified time waives the right to appeal the order.

[50] See the previous footnote.

motion be **DENIED** as to the portion of Count III that pertains to retaliation concerning Ward.  To the extent set forth above, the motion to strike (Docket Entry # 63) is **ALLOWED** in part and **DENIED** in part.

    __/s/ Marianne B. Bowler_____
    **MARIANNE B. BOWLER**
    United States Magistrate Judge